STATE v. JOE CAIN ET AL.

(Filed 12 November, 1919.)

1. **Homicide—Murder—Manslaughter—Evidence—Malice—Instructions.**

     Evidence that the prisoners tried for homicide were operating an illicit still in the neighborhood of the house of the deceased, which had been captured and destroyed, that the prisoners accused the deceased of giving the information, and threatened him if the still was not replaced by a certain night, and within a short time thereafter the killing occurred at night at the home of the deceased, with testimony that the prisoners attacked in a body, firing a number of shots, one of which took fatal effect, is sufficient to show motive and killing with premeditation, and to justify a verdict of murder in the first degree, and, without further testimony, for an instruction that there was no evidence of manslaughter; or, *Semble,* of murder in the second degree.

2. **Homicide—Murder—Evidence—Dying Declarations.**

     Dying declarations as to the identity of the prisoners on trial for a homicide are not rendered incompetent to be submitted to the jury by the fact that the physician, to whom they were made, told the deceased, after the former had said he would die from the wound he had received, that he would not, the deceased then reaffirmed that he would. The court having found that these statements were made under an impending sense of death, properly left them to the consideration of the jury.

3. **Homicide—Murder—Evidence—Common Design.**

     Where there is evidence that the prisoners threatened the deceased if he did not replace a destroyed still they accused him of giving information about, and that the prisoners attacked the home of the deceased in a body at night, all firing upon him, and one of the shots taking fatal effect, a charge is correct that if the jury should find beyond a reasonable doubt that the prisoners formed a common design and purpose to go to the house of the deceased and assault him with firearms, or to inflict great bodily harm upon him, and in pursuance thereof, one of them shot and killed him according to a common purpose, all the prisoners would be guilty of murder in the first degree.

4. **Appeal and Error — Homicide — Murder — Instructions — Typographical Omissions.**

     Where, upon the trial of an action for a homicide, the question of error devolves upon whether the several prisoners, or some of them, were guilty

of murder in the first or in the second degree, an exception to a part of the charge, "if you find any of the defendants guilty of murder in the second degree, because only one defendant could be guilty of murder in the second degree," will not be sustained, when construing it with the balance of the same paragraph, it will appear that, through typographical error, there was an omission of the only words which would give the instruction a meaning, and when thus given would render the charge a correct one, and that the jury must have so understood it.

5. **Appeal and Error — Homicide — Murder — Objections and Exceptions — Amendments.**

On appeal from a conviction of murder in the first degree, *Semble*, exceptions to the charge omitted by counsel's oversight may be supplied on a *certiorari* from the Supreme Court, but they were not allowed in this case because of no merit in the errors alleged.

6. **Appeal and Error—Objections and Exceptions—Instructions.**

An exception to an instruction as to one of several defendants having formed a common design to commit a homicide with the others, is immaterial as to him on appeal, when it appears that he was acquitted at the trial.

ALLEN, J., concurring in result.

APPEAL by prisoners from *Lane, J.,* at February Term, 1919, of SURRY.

The prisoners, Joe Cain, Joe Bowles, and Gardner Cain, were convicted of murder in the first degree of Riley Easter, and from the sentence thereon appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*
*Folger, Jackson & Folger and J. C. Biggs for prisoners.*

CLARK, C. J.   There was evidence of motive that the prisoners were operating an illicit still in the vicinity of Riley Easter's home, and that the deceased and his son, James Easter, knew of it; and that the prisoners accused Riley Easter and his son of giving information which caused the still to be captured and destroyed; that they made threats and sent him a message that if it was not replaced that there would be trouble, and there was evidence that Walter Cain, son of Joe Cain, went to the Easters and gave him notice that the other defendants were enraged at his having had the still taken, and unless put back by Sunday night they would do some injury or violence to him.   There was evidence that the still was not returned by Sunday night, and that on the next night Riley Easter was slain.   There was also evidence that one Andy Martin was induced by John Hicks, one of the defendants, to go to Easter and warn him to put the still back.   There was much other evidence to the same purport, and that on the Monday night in question

Joe Bowles, Joe Cain, Gardner Cain, and John Hicks were seen and identified by the inmates of Riley Easter's house, and also by Riley Easter himself; that they knew these men, having lived in that community for some months, seeing them frequently; that these men had come to Riley Easter's house often, and spent much time there; that on this Monday night Mrs. Easter and her daughter were out of doors, it being moonlight night, the moon well up, and about ten or eleven o'clock at night, as they testified, these four men came up near the house, one of them testified that she knew Joe Cain's voice; Mrs. Easter and her daughter, Mrs. White, ran to the house, and as they got in the door they exclaimed that these four men were out there, calling them by name. The son, Jimmie Easter, was in the house, and Riley Easter went to the door, thinking it was revenue officers, and said, "Hello," and invited whoever it was to "come in"; that there was then the simultaneous report of four guns, and a bullet struck Riley Easter, entering his body, and subsequently causing his death; that at that time it was so bright that Riley Easter was able to recognize the men out there; that the firing became rapid, from four guns, and Mrs. Easter testified that she saw flashes coming from four weapons of some kind in the hands of these four men; that she was able to recognize the three defendants who were convicted and Walter Cain; that a number of shots were fired into the room or side of the house, some going into the room or side of the house, some going into the room, and that these men then made a rush for the door; that James Easter then got his pistol and fired two shots; that the inmates closed the door to keep the assailants out, but the door failed to close fully, leaving a sufficient opening to see out; that these men were pushing against the door, and Mrs. Easter saw Joe Cain appearing through it, seeing him plainly; that one of her daughters from another door had also seen these men and recognized them and other inmates of the house say they saw these men and identified them. One of the women said: "You have killed pap and my baby." Then these men got off the steps at the door and went away. There were a large number of shots fired, as appeared by the bullet holes on the door facing and door, as testified to by officers and other persons. A shotgun and pistol were found next day at Walter Cain's, and there was also evidence that Gardner Cain owned a repeating rifle and a pistol, and that Joe Cain also had guns and pistols. These weapons which were found at their houses or known to have been owned by them and found in their vicinity, were put in evidence.

Riley Easter stated to Dr. Hollingsworth when he first came in that he was going to die. Though the doctor told him he was not, Riley Easter repeated the statement that he was going to die, and said that these men, naming the defendants and Walter Cain, had killed him. He

said they were all shooting. The judge found as a fact that Riley Easter made these statements under an impending sense of death, and admitted them as dying declarations, with proper instructions. Riley Easter died 10 a. m. after the night he was shot.

There were exceptions to the admission of evidence, and to one or two alleged errors in reciting the contention of the parties. But they do not require discussion. The evidence that Riley Easter, notwithstanding the remark of the doctor that he would not die, repeated that he would, and subsequently made his declaration that these prisoners had shot him in the manner above detailed. The doctor testified that he thought then Riley would die. The two alleged errors in the recital of the evidence by the judge are very slight, and he told the jury that they must take their own recollection of the testimony. The two exceptions chiefly relied upon are the following statements in the charge: "Now, if the jury shall find from the evidence in this case, beyond a reasonable doubt, that these defendants, Joe Cain, Gardner Cain, Joe Bowles, Walter Cain, and John Hicks formed a common design and a common purpose to go to the house of Riley Easter and assault him with guns and pistols, or to inflict any bodily harm upon him or the inmates of his house, and if you further find beyond a reasonable doubt that in pursuance of this common design and purpose entered into and agreed to by all of them, that they were there, and that when Riley Easter came to the door some one of them fired a shot into his body from a weapon and killed him, and that this was done in pursuance of the common design entered into by all of them, and death was caused to him in that way, after it had been premeditated and deliberated upon by them, and they did it with malice, then all would be guilty of murder in the first degree."

There was evidence of the motive and of the threats of these prisoners, that they came up about 11 o'clock at night armed with deadly weapons, and all four of them firing simultaneously at Easter and into the house, and evidence by the inmates identifying the prisoners. In this instruction there was no error.

When the officers sought to arrest the three defendants who were convicted, and went to Joe Cain's house, his wife said he was not at home, but he was found in the loft in which there was no floor, and to which there was no access by ladder or steps. The officers found Gardner about 300 yards from his house in the woods, lying between two logs, with his pistol tucked under some leaves near his head. Joe Bowles was found covered up in bed with all his clothes on. A shotgun and his clothes were found in a tree not far from Gardner Cain's house. Walter Cain and John Hicks, who alone of the prisoners went upon the stand, testified that they were not present at the shooting and were acquitted. Walter Cain testified, however, that he was at the Easter's Sunday morn-

ing, and told them that they had better take that thing back to keep down trouble for his father (Joe Cain) and Gardner Cain were mad about it, and that he had seen a shotgun at Gardner's house like the one that was found near there.

John Hicks also testified that he told Andy Martin that he thought the Easters were going to get into trouble, and to tell them to take the still back.

The court charged the jury explicitly "by premeditation and deliberation is meant the forming of a design, a purpose, weighing it in the mind, thinking it over, deliberating upon it, turning it over in the mind, as it were." There was no exception to this nor to the definition of malice, or any other part of the charge as to these prisoners except the following: "If you find any of the defendants guilty of murder in the second degree, because only one defendant could be guilty of murder in the second degree."

This assignment of error is defective, because it is a mere paragraph taken out of a longer sentence, but taking the whole sentence to make it intelligible, it reads as follows: "If you find the defendants guilty of murder in the first degree, then your verdict will be guilty of murder in the first degree; if you find any of the defendants guilty of murder in the first degree, you will specify, of course, which one; if you find any one of the defendants guilty of murder in the second degree, because only one defendant could be guilty of murder in the second degree."

It is transparent that there was a typographical error in omitting before the word "because" in the last paragraph, "You will specify, of course, which one." Otherwise, the sentence excepted to is insensible. If error, this was error in favor of the prisoners.

The only other exception to the charge is to the following: "The State contends, therefore, that you should find from the evidence, beyond a reasonable doubt, that he (Walter Cain) was a party to the common purpose and design entered into by all of them, that they do injury or death to Easter." Walter Cain was acquitted. Neither of the defendants, except Walter Cain and John Hicks, went upon the stand, both of whom were acquitted.

The judge properly instructed the jury that there was no evidence of manslaughter. He might have gone further and told them that there was no evidence of murder in the second degree, for upon this evidence of a concerted attack simultaneously made with firearms, late at night, upon Riley Easter and the house, by the prisoners firing simultaneously, and approaching in a body, taken in connection with the threats and the preparation of weapons, if believed, there could only be one question— the identity of the parties. But the judge left to the jury the question as to whether the killing was murder in the second degree, but charged

that if it "was by premeditation and deliberation and malice, done in pursuance of a common design entered into, common enterprise entered into by all of them, after it had been premeditated and deliberated upon by them, and they did it with malice, then they would be guilty of murder in the first degree."

The evidence against the prisoners was fuller and more complete than above set out, but sufficient is recited to point the exceptions taken. The law is thus clearly stated in a recent case by *Brown, J., S. v. Walker,* 173 N. C., 782: "Premeditation and deliberation, like any other fact, may be shown by circumstances and in determining as to whether there was such premeditation and deliberation the jury may consider the entire absence of provocation, and all the circumstances under which the homicide is committed. *S. v. Roberson,* 150 N. C., 837; Carr on Homicide, sec. 72. If the circumstances show a formed design to take the life of the deceased, the crime is murder in the first degree. This subject is so fully discussed in the many cases in our reports that it is useless to pursue the matter further." The facts were carefully stated to the jury, and the law laid down according to the precedents. It would be difficult to find any set of facts which, if believed by the jury, would more completely constitute malice, premeditation, and deliberation than those testified to in this case, and which the jury found to be true under the charge of the court.

In the oral argument here counsel for the prisoners presented objections to the charge, which are not set out in the exceptions taken on the trial or in the assignments of error. In a matter of this importance it may be that if exceptions of importance were omitted by oversight the Court would, by amendment, allow the assignment of error to be entered here, but we have examined the alleged errors and find no merit in them.

After the fullest consideration of the evidence and the charge, and the argument of counsel, we find in the conduct of the trial nothing prejudicial to the rights of the prisoners.

No error.

ALLEN, J., concurring in result: I think there are several errors in the charge as it appears in the record, but they are not excepted to, presumably because the charge was not transcribed correctly by the stenographer, and as there is no error in the exceptions taken, and it appears to me that the prisoners began firing simultaneous when the deceased appeared at the door of his house, and could have had but one intent, and that was a common purpose to kill. I agree to the judgment of the court. As I read the record the question in controversy was one of identity, and that has been decided against the prisoners under instructions which are free from criticism on the controverted issue. I do not

wish to animadvert on the judges of the Superior Court, knowing as I do the many duties they have to perform, but they owe it to themselves and to the public to scrutinize the records we are called on to review.

In this case the judge is placed in the attitude of charging that the burden was on the defendants to show matters in mitigation beyond a reasonable doubt, when he doubtless charged "not beyond a reasonable doubt, but to the satisfaction of the jury." This was not excepted to.

In another case at this term one of the most learned judges on the Superior Court bench appears to have held that the vendor of personal property has a vendor's lien for the purchase money which deprived the vendor of his personal property exemption as against the purchase money, because he signed a judgment hastily for the accommodation of parties, not knowing the question was raised.

Much of the difficulty about records arises from the extension of the statutory time for making up the case on appeal, and while I would not favor withdrawing from counsel the right to extend the time by consent, I am of opinion a rule ought to be adopted that there shall be no further extension of the time entered upon the record without the written approval of the judge, before whom the action is tried, as in this way he may have the opportunity of settling the case before he has left the district or has overlooked many of the incidents of the trial.