*32
 
 Henderson, Judge,
 

 delivered the opinion of the Court:
 

 After stating the facts and the questions as they appear upon the record, he said, the ground of the first reason for a new trial is not sufficiently proved.
 
 Ruth
 
 states, that Peck
 
 informed
 
 him that he had formed an opinion. When Peck said so, he was not on
 
 oatli;
 
 and when offered as a Juror, he denied it
 
 on oath.
 
 The second reason is in the same situation. It does not appear what was tiie state of Peck’s mind at the time he took his seat as a J uror. One of the witnesses speaks of his situation twelve months past; and, although he saw him drinking during the week of the trial, he does not pretend to say that his mind had actually become affected, but concludes that possibly if might. The affidavit of the other witness does not prove any thing; and both taken together, can scarcely raise a doubt, much less satisfy us, that the Juror was deranged when he was sworn on the Jury. The nature of the disqualification would render it perceptible to many of the numerous by-standers, who commonly surround a Court, and more full and satisfactory evidence of the fact, if true, should have been produced.
 

 Were I left to myself, unshackled by adjudications, I must confess that I should be inclined to respect the third
 
 reason;
 
 but it is in vain for me to contend against precedents — I must submit to the law as I find it written, and my brothers entertain no doubt* of the correctness of the decisions upon principle. The declarations of the party, say they, cannot be offered in evidence in his behalf, unless they accompany acts. They then form part of the acts, and, as such, are heard. But, with due deference to these opinions, it appears to me, that a man’s acts are as much within his control as his words, and that both ought either to be received, or both rejected. Yet it is the daily practice to give the party’s acts in evidence for him. I do not contend, that the party’s declarations should be given in evidence for him to prove the truth of the facts declared or asserted by him 3 but only that the J ury should be at
 
 *33
 
 liberty to draw inferences from his having made such declarations.
 

 The last reason is, that the Court refused to instruct the Jury as to the effect of the testimony, allowing it to be true, relative to the title of the slave Caleb. This is a demurrer to evidence
 
 ore terms.
 
 Observing that the evidence does not prove the property in the deceased to be otherwise than as laid, is it then a fatal defect, even if it be admitted that it does not prove the property to be as laid? ¥e think it is not. The ownership forms no part of the offence it is equally criminal to kill tiie slave of one person as of another. The prisoner is no further interested in having that stated, than for the sake of identity. We give no opinion upon a case, where it is proved that the property is in a different person from the one alleged in the indictment. Had the prisoner been acquitted by the Jury for this defect of proof, there can be no doubt but that on a second indictment for killing the same slave Caleb, charging him to be the property of some other person than F. S. Marshall, he could safely rely on a plea of such acquittal, with proper averments that the slave Caleb, mentioned in one indictment, is one and the same person with the slave
 
 Caleb
 
 mentioned in the other. This incontestibly proves, that the title or ownership of the slave is not of the essence of the offence of killing him. For then an acquittal upon the charge of killing a slave, the property of A. could not be an acquittal for killing a slave, the property of B. This case is within the principles of
 
 Pye’s
 
 case, and that of
 
 Susanna Johnson. Pye
 
 was char ged with robbing a person in the dwelling house of A 5 the robbery was proved to have been from the person, but it was not proved to whom the house belonged. Upon conference of all the Judges, it was held to be immaterial.
 
 *
 

 The motion for a new trial must, •therefore, be overruled.
 

 
 *34
 
 To avert the punishment which the Law has affixed to
 
 murder,
 
 the counsel for the prisoner insists that he is enti-tied to
 
 clergy.
 
 This depends on the construction of the act jn connection with former acts on the subject of murder. As a preliminary remark, I will observe, that at the Common Law, all felonies (murder inclusive) are punishable with death. But a clergyman, from the veneration in which the clerical character was held by the founders of our Law, was exempted from the punishment of death, if the bishop would claim him as a clerk, — and of his being so, reading was the evidence. Hence came the benefit of clergy. In process of time, this benefit was extended to all persons ; and thence it came to psss, that the most enormous crimes were unpunished. Tiic Legislature perceiving this, hath proceeded, from time to time, to take away the benefit of clergy from certain offences. The consequence is, that clergy is allowable in all felonies, but where it has been expressly ousted by statute. The question, therefore, is reduced to this : Is the benefit of clergy taken away from
 
 the offence,
 
 of which the prisoner is convicted ?
 

 The statute 23 Hen. 8, c. 1, ousteth clergy in cases of wilful murder, of malice prepense. Our slat. 1817, c. 18, declares the offence of killing a slave shall thereafter be considered and denominated homicide, and shall partake of the same degree of guilt, when accompanied with the like circumstances, that homicide does at Common Law. The prisoner has been convicted of killing the slave
 
 Caleb
 
 with malice
 
 aforethought;
 
 and such a killing of a human being is, at the Common Law, murder. Of murder, therefore, is the prisoner guilty. The effect of the act of 1817, is to give to a slave the character of a human being, and to place him
 
 within the peace
 
 of the state, as far as regards his life. This latter act, therefore, virtually declares this offence to be murder, and the statute 23 Hen. 8, takes away clergy. Nor does it make any difference whether the benefit of clergy be taken away by the same statute
 
 *35
 
 which creates the offence, or by any other, prior or subsequent. For, when the supreme, authority creates an of-fence, giving it a well known legal and technical name, the offence assumes all the qualities of its name : that is, it becomes the thing the Legislature declares it shall bo. Our statutes of bigamy, mentioned in the argument, bear no analogy to this case. The statute 1790, provides tiiat bigamy shall be felony, and that the felbn shall suffer death: yet a person, convicted under it, was allowed his clergy, because it was not taken away by that
 
 or any other
 
 stahiie, and, at Common Law, it still remained. We are not, however, left to our own reasoning alone, upon this question ¿ the authorities arc the same way. Foster, in his Treatise, lays down the Law thus:
 
 *
 
 The stat.
 
 de Clero 25
 
 Ed. 3, provides that clerks convict for treasons, or felonies touching all persons, other than the King himself, or his royal majesty, shall have privilege of Holy Church. Treasons created by after statutes relative to the coin, the establishing of the King’s regal, and abolishing the Papal supremacy, were ousted of clergy without express words, as coming within the exception of tiie
 
 slat, de Clero,
 
 because they were treasons
 
 touching the King’s
 
 royal majesty.
 

 We are therefore of opinion, that the prisoner is not entitled to the benefit of clergy, and tiiat judgment of death be. awarded against him.
 

 *
 

 2 East’s Cr. L. 785.
 

 *
 

 Fost. Tr. 190, 191.