## STATE v. ED ALEXANDER.

(Filed 2 June, 1920.)

**1. Homicide— Murder— Evidence— Declaration— Written Statements— Burden of Proof.**

Upon a trial for murder, a written statement made by the deceased as to the facts constituting his murder, when aware of the opinion of his attending physician that he would not live through the night, comes within the principle of the competency of dying declarations, made under an impending sense of approaching death, and may be introduced by a witness present at the time, and aware of the circumstances under which it was made, with the burden of proof on the State to show such circumstances beyond a reasonable doubt.

STATE *v.* ALEXANDER.

**2. Homicide—Murder—Defenses—Insanity— Evidence— Opinions— Self Serving Declarations.**

Under a plea of insanity as a defense for murder, witnesses may testify to facts from which the jury may infer the unfounded apprehension of the prisoner that an enemy would attack him, but may not express an opinion as to the existence of this as a fact, or why the prisoner did not carry a weapon; and the prisoner's statement of why he did not do so, is a declaration in his own behalf; but under the evidence in this case, it is held to be immaterial.

**3. Homicide—Murder—Insanity—Evidence—Declarations.**

Declarations of the prisoner on trial for murder and relying upon the plea of insanity, in defense, must in themselves be evidence of the unsound condition of his mind at the time he committed the offense, to be competent.

**4. Homicide— Murder— Insanity— Evidence—Experts—Conversations— Declarations.**

The testimony of an expert on mental diseases in behalf of a prisoner being tried for murder and pleading insanity as a defense, is competent of conversations with the prisoner tending to show that he was unresponsible when he committed the crime, but they must not incorporate therein the self-serving declarations of the prisoner that shed no light on the condition of his mind at that time.

WALKER, J., concurs in the result.

APPEAL by prisoner from *Shaw, J.,* at January Term, 1920, of IREDELL.

The prisoner convicted and sentenced for the murder in the first degree of James Rayle, appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*R. B. McLaughlin, R. L. Wright, Dorman Thompson, and W. D. Turner for prisoner.*

CLARK, C. J.   There seems to be no conflict as to the circumstances of the homicide, which were given in by eye-witnesses, and which somewhat condensed are as follows:   On the night of 23 December, 1919, in a poolroom at Statesville, the prisoner, Ed. Alexander, went up to Jim Rayle, the deceased, and put his arm around his neck and commenced boring him in the ear with his right arm, which was a stub of an arm. Rayle put up his arm and pushed him over, but did not hit the prisoner, who got up and said:   "You are mad at me, aren't you?" and repeated it two or three times.   The deceased told him he did not want any one boring him in the ear with the nub of his arm.   The prisoner stayed around there five minutes, and then walked out of the room, and in

about three-quarters of an hour returned and came down the south aisle of the building, and when he got to the pool table where Rayle was, he called him a vile epithet, and cursed him and commenced shooting. The deceased had not said a word when the prisoner came back with his gun.

G. R. Reynolds, who testified as above, further said Rayle was standing over the desk and was playing pool, and witness was keeping tally on a slate. When Alexander began shooting he walked up to the pool table where Rayle was playing with his hand in his pocket, and when he got up to the table he jerked the gun out of his pocket before he opened his lips and called Rayle and cursed him, calling him a vile name and commenced shooting across the pool table. Rayle started up the aisle towards the front door, and when he got about 20 feet to the end of the second table he turned around and faced the prisoner with the most horrified expression on his face, the witness says, he ever saw on any man, and the prisoner shot him again, and the deceased fell. When Rayle fell he said: "Oh God, some one help me up." The witness says he went under the table, as he was somewhat between the two men, and afraid he would get shot himself. There were three more shots fired by the prisoner after Rayle fell. The first shot the prisoner fired was across the pool table, and Rayle started towards the front door, and when he turned around and faced Alexander, the latter fired the second shot. The deceased fell, and Alexander shot three more after he fell, standing over the deceased while lying on the floor. It was a 45-calibre pistol. The first shot fired towards Rayle missed him, probably two feet. Two of the bullets went straight down in the floor where Rayle was lying, the first shot went through an inch and a quarter plank and then through the wall. After the prisoner had fired the 5 shots he went out the back door. He came in the front door when he fired the first shot. Reynolds further said: "When he came in the room the first time he didn't look like he was mad, but when he returned after three-quarters of an hour's absence and drew his pistol he looked like he was mad when he came in. There were 50 or 75 people in the room. He passed by all but four people before he got to Rayle." The witness says he dived under the table after he fired the second shot. It was about 9 o'clock at night. Rayle stayed in the building half or three-quarters of an hour after he was shot. The witness took his head in his lap after the shooting was over, and Rayle said: "He just didn't give me the chance of a dog, did he?" Witness replied: "No; he didn't." We laid him on the pool table. Dr. Cloninger said there was not much use to take him away. He died about 2:30. There was one hole in his side. The bullet went in and lodged in his back. He was not bleeding when they laid him on the table. Witness did not

hear Rayle say anything to Alexander after Rayle fell, and while Alexander was still shooting at him. The only word Rayle spoke was, "Oh, God, some one help me up." Witness says he did not observe Alexander was there when he came back till he saw him walking down the aisle. The first time was about 7:40, and not so many people there. When the prisoner came in then he put his arms around the witness's neck and seemed to be friendly, and they went out the door together. He told the witness that he had not had but three drinks that day. The prisoner's right arm was about half off.

Barron Moore gave substantially the same evidence. I. J. White testified that he was there at the time of the homicide, and the first time he saw Alexander was when he advanced up the table and shot right down between the tables where Rayle was lying. He saw the fourth and fifth shots. After the fifth shot the prisoner went between two tables and turning his back to the wall he seemed to be loading his gun. He seemed to be walking straight, did not look like there was anything wrong with him.

C. L. Gilbert testified that he was a policeman, and that night after the homicide he and his son were looking for the prisoner and saw him coming through a little pasture in the lot back of Thompson's garage. He was coming towards the fence. The witness went to meet him, and when in 8 or 10 steps of him he covered Alexander with his gun and told him to throw up his hands, which he did, and said: "That is all right. I have no gun. It is all off." The witness sent for Johnson, another policeman, who brought his auto up. They helped the prisoner across the fence, when he said: "I haven't got any gun." The witness then said to him, "Ed., you have played the devil tonight," and he said, "I don't give a God-dern. I don't allow any man to do me like he did and get by with it." When they came out on the street there was a considerable crowd in front of the pool room, and he wished to go through them, but I would not let him do so. The witness had him by the arm, and Alexander asked him twice to turn him loose. This was 25 or 30 minutes after the shooting. The prisoner seemed to be perfectly cool. Didn't seem excited at all. The witness has never been able to find the pistol.

Lee Fulp testified that after the first shot was fired he ran out, and when he came back he met the prisoner near the back porch, who asked what he was running for, and the witness said to get out of the way of those bullets. The next thing he said was, "He knocked me down, didn't he?" Prisoner asked him this twice. He then said: "Don't tell any one you saw me." He had his gun holding it up to his breast with his stub, and was working it with his left hand, making a noise. The witness said he could tell he was drinking some—not drunk.

Mrs. L. A. Thompson testified that Alexander came to her house that night about 9 o'clock and said: "I came after my gun." And soon after said: "I must go," and went off. My son called from his room and said: "Ed., what are you going to do with that gun?" And he said, "I am going possum hunting." She says by "gun" she meant a pistol. It was an army pistol which her husband had borrowed about two months before when he went on a deer hunt. Her house is a little over a quarter of a mile from the poolroom. When the prisoner came in she does not think he had been drinking; did not see anything wrong with him. There was evidence from the nurse and doctor and the undertaker proving that the bullet was the cause of the death.

Indeed, there seems to be no conflict as to that or the details of the killing, and the defense set up is insanity.

The first exception was to the admission in evidence of the statement signed by the deceased. Lorene Johnson, a trained nurse, stated that the deceased "told Mr. Cornelius that the doctor had told him he was going to die, and he asked me how long I thought he would live? I told him I did not know; that we hoped he might live through the night." Soon afterwards he said to Mr. Cornelius, "Ed. has killed me. The doctor says I am going to die." About 25 minutes after this conversation he made the statement which was put in writing and read over to and signed by him, which is as follows: "I was sitting on the desk in the pool room when Ed. come in; he put his arm around my neck, then put his fist against my head. I shoved him back against the door and Ed. fell. He got up and said: 'You took advantage of me, didn't you?' He said, 'I will get the advantage of you,' and went out, and was gone about 20 minutes. First thing he said when he got back was, 'I got you now, you damn son of a bitch.' As he threw up his pistol he fired a shot and missed me. The next shot hit me and I fell. He then ran around the pool table and shot me again. I could not say whether he hit me or not, the next shot. I said, 'Ed., don't kill me.' He was loading or trying to load his pistol again when I last saw him while I was still on the floor.

"This was read over to me, and I signed this statement. This 23 December, 1919.                                        J. C. RAYLE."

The witness testified that Dr. Cloninger, the sheriff, the gentleman who wrote down the statement, H. L. Troutman, and herself were present when the statement was read over and signed by the deceased, who, when he was asked to sign the statement, inquired how long he would live, and was told he "might live through the night."

The evidence shows that the deceased made this statement under an impending sense of approaching death, and it was competent. *S. v. Cain,* 178 N. C., 724; *Lumber Co. v. R. R.,* 151 N. C., 220; *S. v. Finley,*

STATE *v.* ALEXANDER.

118 N. C., 1161; *S. v. Caldwell,* 115 N. C., 794; *S. v. Whitt,* 113 N. C., 716; *S. v. Whitson,* 111 N. C., 695; *S. v. Williams,* 67 N. C., 12.

Exceptions 2, 3, and 4 are to the exclusion of answers to questions to Mrs. W. M. Alexander, mother of defendant, who was being examined as to the mental condition of the defendant, said: "During these times I have just described I think his mind was badly deranged. The only restraint that was given was just through kindness. I humored him. We were all afraid of him. One night Edgar came home. He imagined a man up town had done him an injustice, and he came in and said he was going to get his gun and go back, but a friend came with him. Together we got him quieted down, and he didn't go out any more that night." She was then asked: "Did he imagine somebody was an enemy to him?" The court, upon objection, excluded the answer to this question. The witness can be required to state the facts upon which she bases her opinion that the defendant was insane. She could state facts from which the jury may infer that the enemy whom he was going to attack was purely imaginary, but she could not express an opinion as to the existence of a fact as she was asked to do here. The same may be said to exception 3 for the exclusion of the question, "Why didn't he carry a pistol or gun or a knife." Exception 4 was for the exclusion of the answer to the question, "Did he himself state why he didn't keep a knife or gun?" This was calling for a declaration of the prisoner on his own behalf. The witness had already testified to such facts as threw light upon the mental condition of the prisoner at that time. The answer to this question was immaterial to the issue as to his sanity.

Exception 5. The brother of the defendant, a soldier in service, had testified that in his opinion the defendant was insane, and was giving facts upon which he based his opinion: "We were walking along the street. Edgar made some remark that should not have been said in the presence of ladies. I corrected him for it. He jumped on me and beat me. I didn't fight him back, and I held him until some of my comrades came by and we got him quieted down, and went on off—took my lady friend back home. When I went back to the barracks Edgar was in my bed—he was sleeping in my bed at the time. He was asleep when I went down that night, about 10:30. I asked him next morning—"

This was offered to show by this witness that he didn't know anything the next morning, and the judge excluded it because "the witness does not state that the prisoner was not drunk at the time that this assault was made upon him. The other evidence in the case shows that defendant did drink frequently, and became wild under the influence of liquor. His forgetfulness then, if he did forget, of what occurred the afternoon before would not tend to show that he was insane. Any declaration

made by him in order to be admissible in his favor must plainly be in itself evidence of his insane condition."

Exceptions 6 and 7. The expert, Dr. J. K. Hall, had been testifying at great length for the defense when the following occurred: "Defendant proposes to show by the witness that in an examination of Edgar Alexander, the defendant, relative to his history and of the crime he is charged with, and the answers that he made to such questions to the expert under the examination formed the basis of his conclusion of the mental condition of the defendant.

"The State only objects to so much of the examination as brings out the declarations of Ed. Alexander and the conversation with him. No objection to the conclusions he reaches."

"The jury is sent out while the court examines the witness. After the jury came in, the court told the jury as follows: 'The witness is permitted to state to the jury any act that was performed by the defendant in his presence, or any declaration or statement made by the defendant in his presence upon which he based his opinion as to his mental condition. But the witness is not permitted to state any declarations which may have been made to him by the defendant as to events that had happened in his past life, or his statement of any declarations that he may have made in his past life for the purpose of basing his opinion as to the mental condition of the defendant.' "

Again, the court restated his ruling as follows: "The ruling is that you are not permitted to state what the witness told you about his past life, and not to consider what he told you about his past life; but if there is anything in the manner in which he told you things that made you form your opinion, then that would be competent. In other words, if he said anything at the time that indicated to your mind that he was a man of unsound mind, the manner in which he did it would be competent, and you may narrate it; but if your opinion is based upon what he told you about the past transaction, it would not be competent."

His Honor in these rulings was drawing a distinction between facts drawn out in Doctor Hall's conversation with the defendant, which tended to show the state of defendant's mind and those which did not. Conversation with one alleged to be insane is, of course, one of the best evidences of the present state of his mind. If, however, there is incorporated in the conversation self-serving declarations which in themselves do not throw any light upon the present condition or the past condition of the man's mind, then these declarations are not admissible.

"The opinion of a physician based in part, at least, on representations made to him by the defendant or others prior to his trial, on the question of his insanity, cannot be considered in a criminal prosecution." *United States v. Faulkner*, 35 Fed., 730.

"An expert witness in a criminal prosecution cannot give his opinion as to the sanity or insanity of the accused at the time of the criminal act, based upon the story told by the accused himself,. which is not in evidence, especially when the statements were made by the defendant long after the criminal act." *People v. Strait,* 148 N. Y., 566. The same Court, in *People v. Nino,* 149 N. Y., 217, draws the distinction between the two classes of declarations by the defendant thus: "All that this defendant said and did during these several examinations by the experts was competent, as bearing upon his mental condition at the time he was examined. It is quite true that the declarations of a defendant to an expert on insanity, as to past transactions and events, are not competent evidence to determine his mental condition at some time previous to the examination. *People v. Hawkins,* 109 N. Y., 408; *People v. Strait,* 148 N. Y., 566. We have no such situation presented here. This is not the case of a man claimed to be insane at the time of the homicide, and admitted to have been sane ever since. This is a case where it was asserted that the defendant had been continuously insane from a period of four months before the killing up to the time of trial. The examination of the experts was directed to his mental condition at the time they saw him; and from the conclusion they then reached, and the medical and other facts proved, they would be competent to give, on the trial, an opinion as to his sanity or insanity at the time of the homicide. The jury are entitled to the facts on which an insanity expert bases his opinion, and when those facts are the result of his own interviews with the defendant, it is not only competent, but necessary, that they should be laid before the jury."

There were 12 witnesses for the State, on insanity, each of whom testified that they had known the prisoner well for many years, one for 20 years, several for 12 or 15 years, others for a shorter period, all of whom testified in effect that he was a man of sound mind, and had shown no indication of insanity. These men were summoned from all classes and vocations in the town where he lived: J. R. Hill, merchant; J. E. Dietz, in the furniture business; Bob Armfield, in the clothing business; W. E. Blackwell, locomotive engineer; B. A. Cowan, depot agent; D. M. Ausley, bank cashier; W. H. Cornelius, lumber dealer; R. L. Sloan, in the clothing business; G. R. Reynolds, who was also witness to the homicide; Hal Gill, one of prisoner's associates; J. M. Deaton, former sheriff, now in automobile business; George Ayres, in transfer business, who had often taken him to and from the railroad station—all these who knew him well and had often met him expressed the opinion that he was of sound mind. Some of them said he drank a little, and had been in several fights and in jail.

The witnesses who testified to acts from which the jury were asked

to infer that his mind was unbalanced were his mother, two brothers, his sister, and his aunt. His former teacher, Prof. Matt Thompson, testified only that he did not come regularly to school, and was not studious, and that he had to use corporal punishment, but he did not say that his mind was affected. His brother, who gave the incident above recited of his using improper language in the presence of a lady, did not testify that he was insane. There were three witnesses who testified that the mother of the prisoner had told them that he had got a lick on the head when he was a child, and that some doctor had told her that some time he would become insane, but they did not testify that he was. One of these witnesses for the prisoner also testified that the prisoner "had been in a good many fights around town," and another of them, on cross-examination, said, "I have never seen anything wrong with his mind—there was nothing to matter with him except he was mean as hell." His uncle, ex-treasurer of Mecklenburg County, testified that the prisoner's mother had told him, "She had been expecting Ed. to get into trouble," but he had never heard of his having any mental trouble, nor of his having any lick on his head. The only other witness for the prisoner as to his mental condition was the expert, who, under our system, is selected and summoned, not by the court, but like witnesses to the fact, by the side for which his testimony is expected to be favorable. The testimony as to the prisoner's mental condition is thus summarized, as it was practically the only issue in the case. The sanity or insanity of the prisoner was a fact for the jury, who, under a charge not excepted to in this particular, have found the prisoner not to be of insane mind, and that he was responsible for his act. The ruling excepted to in regard to the expert was not prejudicial to the result.

The deceased received two bullets, both passing through his body and his intestines. He was struck down by the second shot the prisoner fired. The other bullet was one of the three fired at him while lying on the floor, the prisoner standing over him. The witness, Reynolds, said the first shot missed the deceased two feet and went through the side of the house, whereupon the deceased started for the front door, he being unarmed. The deceased was a married man, and left a wife and three children.

Exception 8. The judge charge the jury that the burden was upon the State to satisfy them beyond a reasonable doubt both that the deceased made the statement offered as dying declarations, and that he did so under the apprehension of immediate death. And unless they did so find both these facts, they should disregard it entirely.

Upon the uncontradicted testimony the deceased, in consequence of what he deemed an undue familiarity, pushed the prisoner down, who

thereupon, with a threat, left the poolroom, going to Mrs. Thompson's residence, something over a quarter of a mile off, got an army pistol, and returning to the poolroom some 45 minues later passed through a crowd of 50 or 60 people down to the table where the deceased was playing pool. Without any notice, and using an oath with a vile epithet, fired at the deceased, who started for the door. But in about 20 feet off he turned and the prisoner fired again. He then fell to the floor, and the prisoner going up to him fired three more shots down at him while lying on the floor. Two bullets passed through him, causing his death. The prisoner then left the building, and was met by the witness Fulp, to whom he said: "Don't tell any one you saw me." Later that night the policeman who was searching for him found him passing through a back lot behind a garage, and arrested him. The dying declarations of the prisoner are in evidence.

The defense of insanity was set up. There was no direct evidence of insanity, but his mother and other near relatives were allowed to testify in regard to his past conduct from which it was contended that the jury could draw the inference that he was insane, and the expert gave in his evidence as a matter of opinion. There was evidence from 12 witnesses of the State, and on cross-examination one of the prisoner's witnesses, who had known him for years, that he was sane. The court seems to have allowed the fullest latitude on the evidence offered of individual acts of the prisoner to justify the inference that the prisoner was insane. The jury found to the contrary.

The prisoner was most ably defended by eminent counsel. We think he has had a full and fair trial, and has no cause to complain, which would entitle him to a new trial.

No error.

WALKER, J., concurs in result.