LEM D. SEAWELL v.
FRANK BRAME AND HALIFAX PAPER CO., INC.

(Filed 1 February 1963).

**1. Evidence § 43—**

The fact that a medical expert is not a specialist in the particular field upon which he gives his medical opinion does not disqualify his testimony, and the court may hold a medical expert specializing in the general practice of medicine, who had had psychiatric training, qualified to testify that the injured party's nervous condition caused the physical ailments he had observed in the injured party, notwithstanding the expert states he is not an expert of the mind and nervous system.

**2. Evidence § 44—**

A medical expert may testify only in regard to facts within his personal knowledge or upon an assumed state of facts supported by evidence and recited in a hypothetical question, and it is error to permit an expert to give his opinion based upon unsworn statements made by the injured person's wife and others.

APPEAL by defendants from *Clark (Heman R.), J.,* April Term 1962 of GRANVILLE.

Plaintiff alleged he was injured on the premises (woodyard) of the corporate defendant in Oxford, North Carolina, when the corporate defendant's Hyster motorized lift (Hyster), operated by defendant Brame, "lurched forward, striking the plaintiff with great force and violence," pinning plaintiff between the front of the Hyster and the side of plaintiff's truck. He alleged his injuries were proximately caused by the negligence of Brame in that he operated the Hyster and failed to keep it under control when he knew or by the exercise of due care should have known that plaintiff was between the front of the Hyster and the side of his truck.

Defendants, answering separately, admitted the corporate defendant owned the Hyster and that Brame was operating it as the corporate defendant's agent. Except as stated, each defendant denied all plaintiff's essential allegations and, as further defenses, pleaded contributory negligence and assumption of risk.

There was evidence tending to show the facts narrated in the following numbered paragraphs.

1. On January 1, 1960, about 9:30 a.m., plaintiff hauled a load of pulpwood logs to the corporate defendant's woodyard. The logs were on plaintiff's truck. The truck had no body or bed. It consisted of the chassis and "a runner." Logs were stacked across the runner. The bottom of the logs was "about practically level" with plaintiff's hips.

2. The Hyster was used to remove logs from trucks and transfer them to railroad cars. Two sets of cables were lowered from the boom. Before logs could be lifted from a truck, it was necessary that, on each side of the truck, a set of cables be put around the bottom of the logs and hooked.

3. As on previous occasions, plaintiff aided employees of the corporate defendant. Plaintiff's truck and the Hyster were in position, the front of the Hyster facing the side of the truck. One lot of plaintiff's logs was removed from the truck and transferred to a railroad car without mishap. Plaintiff had put the cables around the bottom of the logs and hooked them on the side of the truck opposite the front of the Hyster and an employee of the corporate defendant had done so on the other side.

4. The two vehicles were again in position for removal of all or part of the remaining logs. The distance between the front of the Hyster and the side of plaintiff's truck was two and one-half feet or less. The distance was such plaintiff "just could squeeze in." Although not "exactly full sideways" between the Hyster and the truck, plaintiff's left side was toward the ends of the logs and his right side was toward the Hyster. He was attempting to put a set of cables around the bottom of logs then on his truck.

Plaintiff's version: When plaintiff was in the position described above, Brame operated the lift or some portion thereof forward, striking plaintiff's right side and mashing his left side against the ends of the logs. Soon thereafter, Brame backed the lift off of plaintiff. When he stopped, the lift was some three and one-half feet from plaintiff's truck.

Defendants' version: No portion of the lift moved forward while plaintiff was between it and his truck. Plaintiff, for reasons unknown

to defendants, walked out from between the two vehicles saying Brame had mashed him and complaining that his chest was hurting.

The jury answered the negligence and contributory negligence issues in favor of plaintiff and awarded damages in the amount of $15,000.00.

Judgment for plaintiff, in accordance with the verdict, was entered. Defendants excepted and appealed.

*H. F. Seawell, Jr., and Royster & Royster for plaintiff appellee.*
*Maupin, Broughton, Taylor & Ellis for defendant appellant Brame.*
*Teague, Johnson & Patterson and Ronald C. Dilthey for defendant appellant Halifax Paper Co., Inc.*

BOBBITT, J. There was ample evidence to require the submission of plaintiff's case to the jury. Indeed, defendants abandoned their exceptions and assignments of error relating to the denial of their motions for judgment of nonsuit in failing to discuss them in their (joint) brief. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810.

We pass, without discussion, all of defendants' assignments of error except those relating to the basis of our decision. Defendants' other assignments of error are of such nature that discussion thereof would be of no assistance in conducting the next trial.

Plaintiff alleged he "was badly crushed about his back, chest and both shoulders, causing severe abrasions and contusions to the chest, back and both shoulders, a number of fractured ribs and severe, painful and permanent injuries to his back and left shoulder." (No reference to a neurosis, asthma or an ulcer appears in the complaint.)

Evidence offered by plaintiff tended to show, *inter alia*, the facts narrated in the following numbered paragraphs.

1. The Hyster "mashed the breath out of" plaintiff when it came up against him. Plaintiff was "scared." He did not fall to the ground when Brame backed the Hyster off of him. He "hobbled"—"staggered"—out from between the two vehicles. Brame and another person caught hold of him and "led (him) around to the depot." At the depot, he was sick, sweating and still could not get his breath. Too, he was worried. Soon thereafter he was taken to the Granville Hospital and remained there (on this occasion) one week.

2. Upon arrival at the hospital, plaintiff "was half gasping for breath and complained of severe pain in his chest and some in his left shoulder." A physical examination disclosed "slight abrasions on his right shoulder, but otherwise . . . no bruises or marks . . . he was quite

tender to any pressure or touch of the sternum or any of the anterior wall of the chest and . . . pain in the back on the left side when you applied pressure on the chest." An x-ray "suggested fracture of the first right rib." (There was some conflict as to whether a rib was fractured. In either event there were no bandages, no brace and no strapping of his ribs.)

3. When plaintiff returned home from the hospital, he was complaining "about the wheezing in his chest" and about a week later he started complaining about the "burning" in his stomach. Plaintiff was suffering from asthma and from an ulcer.

4. Plaintiff "laid around for about a couple of months" tried to do some work for about twelve weeks but had to quit, and since then has been unable to work.

5. Plaintiff was 58 years old when injured. Prior to January 1, 1960, his general health had been good and he had not suffered from asthma or an ulcer. After January 1, 1960, plaintiff's general health was bad. He now is "highly nervous," suffers from asthma and an ulcer, takes medicine for his condition, and is unable to work.

Defendants assign as error the court's admission of testimony of Dr. C. B. Finch to the effect plaintiff's injury of January 1, 1960, *in his opinion,* either caused or aggravated plaintiff's neurosis and that plaintiff's neurosis caused his asthmatic condition and ulcer.

Dr. Finch saw plaintiff on January 1, 1960, soon after he reached the hospital, and treated plaintiff in the hospital and thereafter.

On direct examination, Dr. Finch testified he had an opinion satisfactory to himself as to what caused plaintiff's asthmatic attacks and ulcer. When asked his opinion defendants objected. Dr. Finch, directed by the court to "Go ahead," testified as follows:

"The opinion is that this fellow developed a neurosis, a nervous condition that led to the formation of an ulcer and of an asthmatic condition. Now, my reasons for saying this are that at first I could not evaluate him accurately *because I did not know his background other than what the patient himself related. After talking to his former employee and after talking to other members of his family and finding out that the man had never suffered any symptoms relative to these he now had before* and for them to onset afterwards and with both diseases known to be at least made worse, if not caused, in the opinion of most medical people, by a nervous condition, I would have to, therefore, associate this with the accident in my own mind." (Our italics)

Defendants' motion that the court strike the (quoted) testimony of Dr. Finch was denied and defendants excepted.

Upon cross-examination, Dr. Finch testified: "I stated that I am not an expert in the diseases of the mind and the nervous system. *My diagnosis was made on the basis of what Mr. Seawell's wife and other people had told me about him in the past. My opinion is based on that.*" (Our italics) Defendants excepted to the denial of their motions that Dr. Finch's testimony "as to mental diseases or anything to do with neurosis be stricken," and that "any hearsay evidence that he has presented here be stricken."

Defendants assert all of Dr. Finch's testimony relating to mental diseases or neurosis should have been stricken when he testified he was "not an expert in the diseases of the mind and the nervous system." This contention is without merit.

"In this connection this Court has uniformly held that the competency of a witness to testify as an expert is a question primarily addressed to the court, and his discretion is ordinarily conclusive, that is, unless there be no evidence to support the finding, or unless the judge abuse his discretion." *S. v. Moore,* 245 N.C. 158, 164, 95 S.E. 2d 548, and cases cited. It was for the court upon all the evidence to determine whether and on what subjects Dr. Finch was qualified to testify as an expert. As stated in *Spaulding v. City of Edina,* 122 Mo. App. 65, 97 S.W. 545: "Whether the doctor considered himself an expert on nervous affections, although a matter to be taken into consideration by the court in order to determine his competency as such, was not conclusive of the question any more than if he had said he was such."

It was admitted that Dr. Finch was "a medical expert specializing in the general practice of medicine." Dr. Finch testified he had psychiatric training while in medical school at Duke but did not hold himself out to be a psychiatrist. Certainly it was within the power of the presiding judge to determine that Dr. Finch was better qualified than the jury to draw inferences from the facts in evidence with reference to the subjects of his testimony. Stansbury, North Carolina Evidence, § 132.

". . . it may be concluded that, by the great weight of authority, a physician or surgeon is not incompetent to testify, as an expert, merely because he is not a specialist in the particular branch of his profession involved in the case; although this fact may be considered as affecting the weight of his testimony." Annotation: 54 A.L.R. 860, 861. It was so held by this Court in *Pridgen v. Gibson,* 194 N.C. 289, 139 S.E. 443.

In *Spaulding v. City of Edina, supra,* the admission of the testimony of a practicing physician concerning the nervous condition of the plaintiff was held proper, although the physician testified that he did not "claim to be an expert on the subject of nervous diseases." In accord: *Sanguinett v. May Department Stores Co.,* 228 Mo. App. 1161, 65 S.W. 2d 162; *Taylor v. Monongahela Railway Co.,* 155 F. Supp. 601; *Parker v. Gunther* (Vt.), 164 A. 2d 152; *McGhee v. Raritan Copper Works* (N.J.), 44 A. 2d 388; *Frye v. Joe Gold Pipe & Supply Co.* (La.), 50 So. 2d 38.

Even so, Dr. Finch was subject to the rules applicable to opinion testimony of expert witnesses.

"It is well settled in the law of evidence that a physician or surgeon may express his opinion as to the cause of the physical condition of a person if his opinion is based either upon facts within his personal knowledge, or upon an assumed state of facts supported by evidence and recited in a hypothetical question." *Spivey v. Newman,* 232 N.C. 281, 284, 59 S.E. 2d 844, and cases cited. "The witness may not base his opinion on facts related to him by the subject whose condition he is testifying about, or by any other person, even though such person be another expert." Stansbury, *op. cit.,* § 136.

Dr. Finch testified he had never examined plaintiff before January 1, 1960, and that the accident on that date was the only thing to which he could trace the ulcer. He testified: "There may be some other facts that I do not know that could have caused it." Plaintiff's wife, plaintiff's former employee, and other members of plaintiff's family, are identified as the source of information on which Dr. Finch based in material part his opinions as to plaintiff's neurosis, asthma and ulcer. What any of these persons told Dr. Finch is not disclosed. Suffice to say, the opinion evidence of Dr. Finch was not based "either upon facts within his personal knowledge, or upon an assumed state of facts supported by evidence and recited in a hypothetical question."

For the reasons stated, defendants' motions to strike the challenged opinion testimony of Dr. Finch should have been allowed and denial thereof was prejudicial error.

Since a new trial is awarded, we need not consider whether defendants were prejudiced by the variance between plaintiff's allegations and evidence in respect of his injuries. Before the next trial plaintiff may, if so advised, move for leave to amend his complaint.

New trial.