MORRIS SPEIZMAN COMPANY, INC. v. WILLIAM H. WILLIAMSON, AND OTHERS, TRADING AND DOING BUSINESS AS REYNOLDS & CO., A PARTNERSHIP

No. 7126SC465

(Filed 15 September 1971)

1. Contracts § 2— binding contract — objective test

In examining the language and actions of the parties in order to determine if a binding contract resulted, the test to be applied is objective and not subjective.

2. Contracts § 2— mistake by one party to contract—avoidance of contract

A party to a contract cannot avoid it on the ground that he made a mistake where there has been no misrepresentation, there is no ambiguity in the terms of the contract, and the other contractor has no notice of such mistake and acts in good faith.

**3. Contracts §§ 2, 21— contract for broker to sell stock — unilateral mistake by seller as to identity of the stock**

Where plaintiff's president instructed defendant stock brokers to sell 14,000 shares of the stock of a foreign corporation reported in a newspaper as listed on the American Stock Exchange under the mistaken belief that stock owned by plaintiff was the same as that listed on the Exchange, when in fact the listed stock was American Depository Receipts, or American shares, and the stock owned by plaintiff consisted of the underlying foreign shares, a binding contract resulted once defendants accepted and acted upon the instructions of plaintiff's president, and plaintiff is liable for breach of contract in failing to deliver to defendants the stock its president had instructed defendants to sell, there being no mutual mistake of fact but only a unilateral subjective mistake on the part of plaintiff's president, and there being no evidence that defendants had reason to know of the mistake of plaintiff's president or that they were negligent in failing to question him as to whether the shares he stated his company owned were American Deposit Receipts or the underlying foreign shares.

**4. Evidence § 48— expert in buying and selling stocks — qualification of witness**

There was ample evidence to support the trial court's finding that defendants' witness was an expert in the field of buying and selling stocks.

**5. Evidence § 48; Trial § 10— finding in jury's presence that witness is expert**

The trial court did not commit prejudicial error in stating in the presence of the jury its finding that defendants' witness was an expert in the field of buying and selling stocks, where the witness was not a party to the litigation and finding him to be an expert in no way dealt with any question which the jury was called upon to decide.

**6. Evidence § 19— evidence as to prior transactions between the parties**

In an action for breach of contract to deliver to defendant stock broker the stock that plaintiff had allegedly instructed defendant to sell for plaintiff's account, evidence as to prior transactions between the parties, while not bearing directly upon the issues in the case, was relevant to establish the course of conduct customarily followed in transactions between the parties, which could provide a basis for determining whether customary procedures were followed in the present case, and whether these resulted in a binding contract between the parties.

APPEAL by plaintiff from *Grist, Judge,* 25 January 1971 Schedule B Civil Session of Superior Court held in MECKLENBURG County.

Plaintiff ("Speizman Company") is a corporation of which Morris Speizman is president and chief executive officer. De-

fendants are copartners engaged in business as stock brokers under the name "Reynolds & Co." The partnership is a member of the American Stock Exchange. Speizman Company and Reynolds & Co. each maintain an office and do business in Mecklenburg County, N. C.

On 5 November 1968 Speizman Company was the owner of 18,179 Ordinary B shares of American Israeli Paper Mills, Ltd., an Israeli corporation. Speizman Company had originally acquired 10,000 of these shares in 1959 in a transaction effected on its behalf by its president, Morris Speizman, in which these 10,000 shares were received in exchange for $10,000.00 Israeli Development bonds. The remaining 8,179 shares had been received by Speizman Company at various times thereafter as stock dividends. In November 1968, the Ordinary B shares of American Israeli Paper Mills, Ltd. were not listed on the American Stock Exchange, but were traded on the over-the-counter market. Prior to November 1968, American Israeli Paper Mills, Ltd., in order to make some of its shares more conveniently transferable and more readily traded in the United States, had deposited a large block of its Ordinary B shares with Bankers Trust Company in New York, which in turn had issued American Depository Receipts (sometimes referred to as "American shares" or "ADRs") on a one for eight basis, i.e., each American Depository Receipt represented eight of the Ordinary B shares of American Israeli Paper Mills, Ltd., on deposit with Bankers Trust Company. In November 1968 these American Depository Receipts had been listed and were being traded on the American Stock Exchange under the ticker symbol "AIP." Speizman Company never owned any of these "American shares" or "ADRs."

On 5 November 1968 Morris Speizman phoned LeRoy Gross, a Registered Representative employed in the Charlotte office of Reynolds & Co., with whom Speizman had had previous business dealings, and told Gross he "had an occasion to think about American Israeli Paper Mills stock which the company owned," and that he "had glanced at the stock quotations of the American Stock Exchange listed in the Charlotte Observer and it was selling at seven dollars a share." Speizman asked Gross to check it, whereupon Gross checked the Wall Street Journal and a telequote machine and confirmed that American Israeli Paper Mills stock as listed on the American Stock Exchange was sell-

ing at the price of around seven dollars a share. At the trial of this action Morris Speizman testified with reference to this phone conversation with LeRoy Gross:

"A minute or so later in that same conversation he (Gross) said: 'That is right. It is selling at seven dollars a share, approximately.' I did tell Mr. Gross that that was fantastic. That this was the first time that any investment I made in Israel had shown a profit. I did at that time tell Mr. Gross that I owned over 18,000 shares of that stock. I did tell Mr. Gross at that time to sell 14,000 shares of that stock for the account of Morris Speizman Company, Inc. I did tell him not to dump it on the market but to merchandise it out in lots of a hundred or several hundred so as not to upset the market. To my knowledge Reynolds and Company executed this order that I gave to Mr. Gross. . . .

"On November 5, 1968, I did not know the difference between American Israeli Paper Mills, American shares or ADRs and American Israeli Paper Mills common or foreign shares. On November 5, 1968, I thought that the shares owned by Morris Speizman, Inc. in American Israeli Paper Mills were those listed on the American Stock Exchange. I assumed they were, yes sir. I did not at any time ask Mr. Gross for any opinion or advice with respect to American Israeli Paper Mills, Ltd."

Following this conversation, Reynolds & Co. placed an order to sell 14,000 shares of American Israeli Paper Mills, Ltd. ADRs as listed on the American Stock Exchange and a sale was made on the American Stock Exchange. On receiving confirmation of this sale, Speizman Company delivered to Reynolds & Co. its certificates for 18,179 shares of American Israeli Paper Mills, Ltd. Ordinary B shares. Upon learning that the stock delivered was not the same as that which had been sold by Reynolds & Co. on the American Stock Exchange, Speizman Company disclaimed any responsibility and denied any liability. As required by regulations of the Securities and Exchange Commission, Reynolds & Co. then purchased 14,000 shares of American Israeli Paper Mills, Ltd. ADRs on the American Stock Exchange in order to fill its commitments to the purchasers on the prior sale. In the meantime, however, the price had risen on the American Stock Exchange and Reynolds & Co. had to pay a

higher price than that received on the prior sale, the net difference (after taking into account brokerage commissions charged by Reynolds & Co. in the amount of $4,099.91, taxes, and other fees involved in the sales and repurchase transactions) being $22,076.88.

Plaintiff, Speizman Company brought this action on 30 December 1968 to recover possession of the stock that it had delivered to Reynolds & Co. Defendants counterclaimed for damages which they alleged they suffered in the amount of $22,076.88. The trial court granted plaintiff's motion for summary judgment on its claim for recovery of the shares of stock. Defendants' counterclaim was submitted to the jury, which answered issues as follows:

"1. Did plaintiff and defendant enter into a contract authorizing the defendant, Reynolds & Company, to sell 14,000 shares of American Israeli Paper Mills, Ltd. American Shares (ADR's) on the American Stock Exchange and for the plaintiff, Morris Speizman Company, Inc. to deliver 14,000 shares of American Israeli Paper Mills, Ltd. American Shares (ADR's) to Reynolds & Company?

"ANSWER: Yes

"2. Did the plaintiff, Morris Speizman Company, Inc., breach the contract?

"ANSWER: Yes

"3. What amount, if any, is the defendant, Reynolds & Company, entitled to receive from the plaintiff, Morris Speizman Company, Inc.?

"ANSWER: $18,976.97"

From judgment on the verdict that defendants recover from the plaintiff $18,976.97, with interest and costs, plaintiff appealed.

*Weinstein, Sturges, Odom & Bigger by T. La Fontine Odom for plaintiff appellant.*

*James & Williams by Henry James, Jr., and Pender R. McElroy for defendant appellees.*

PARKER, Judge.

Appellant assigns as error the denial of its motion for a directed verdict on defendants' counterclaim, made at the close of defendants' evidence and renewed at the close of all of the evidence. In support of this assignment of error appellant contends that as a matter of law the evidence established that the parties acted under a mutual mistake of fact, that there was never a "meeting of the minds" and therefore no binding contract as to what stock was owned by plaintiff and what stock plaintiff authorized defendants to sell, and that any loss sustained by defendants was brought about by their own negligence. We do not agree.

[1, 2] In examining the language and actions of the parties in order to determine if a binding contract resulted, the test to be applied is objective and not subjective. 13 Williston on Contracts, 3rd Ed., § 1536. "The rule supported by the authorities is that if, in the expression of the intention of one of the parties to an alleged contract, there is error, and that error is unknown to, and unsuspected by, the other party, that which was so expressed by the one party and agreed to by the other is a valid and binding contract, which the party not in error may enforce. In other words, a party to a contract cannot avoid it on the ground that he made a mistake where there has been no misrepresentation, there is no ambiguity in the terms of the contract, and the other contractor has no notice of such mistake and acts in perfect good faith." 17 Am. Jur. 2d, Contracts, § 146, p. 492.

[3] When Morris Speizman, acting on behalf of plaintiff as its chief executive officer, phoned LeRoy Gross, defendants' representative, and asked him to check the current market value of American Israeli Paper Mills stock which Mr. Speizman informed Mr. Gross that his company owned, he expressly identified the stock concerning which he inquired as the stock listed in the Charlotte Observer under quotations of the American Stock Exchange and selling at seven dollars per share. When Gross checked and confirmed the price, Speizman testified that: "I did at that time tell Mr. Gross that I owned over 18,000 shares of *that* stock. I did tell Mr. Gross at that time to sell 14,000 shares of *that* stock for the account of Morris Speizman Company, Inc." Thus, objectively there was no mistake as to the identity of the stock which Speizman authorized defend-

ants to sell for the account of plaintiff company. The only mistake was the unilateral subjective mistake on the part of Speizman in believing that the stock which his company owned was the same stock which he had seen listed in the newspaper. Speizman undoubtedly acted in perfect good faith, but the mistake was his nevertheless. Once defendants accepted and acted upon his instructions, a binding contract resulted and plaintiff became estopped to deny liability. "In the final analysis, the objective theory of contracts, as distinguished from the subjective theory, is based on analogy to estoppel." 1 Williston on Contracts, 3rd Ed., § 98, p. 362.

Nor do we find in this record any evidence that defendants had reason to know of Speizman's mistake or that they were negligent in failing to question him as to whether the shares which he stated his company owned were American Israeli Paper Mills, Ltd., American shares, as listed and traded on the American Stock Exchange, or the underlying American Israeli Paper Mills, Ltd., Ordinary B shares. Defendants had not participated in any way when Speizman had originally acquired the shares for his company, and all that they knew concerning the shares was what Speizman told Gross in their brief telephone conversation. Nothing in that conversation would put defendants on notice that Speizman was acting under a mistaken impression in believing that the shares which his company owned were the same as the shares reported in the newspaper as listed on the American Stock Exchange to which he made specific reference. While he expressed surprise and delight that the shares which his company owned had apparently so substantially increased in value, he did not inform Gross as to the amount of the increase, or exactly when the shares had been acquired, or what the original cost of the shares had been. During the telephone conversation, Gross consulted a Standard & Poor's Stock Guide which was on his desk, and this revealed that the American Israeli Paper Mills, American shares, as traded on the American Stock Exchange, had ranged in price during 1967 from a low of 2 to a high of $5\frac{1}{2}$ and during 1968 from a low of $3\frac{1}{8}$ to a high of $7\frac{3}{8}$. Therefore, there was nothing surprising in the fact that an investor in such shares might have realized a substantial gain. While the same Standard & Poor's Stock Guide showed in a footnote "Amer shrs equals 8 ord par Is £ 1," the existence of this footnote would not, in our opinion, put Gross on notice that his customer, Speizman, was

operating under any mistake as to the nature of the shares which his company owned. From previous dealings between them, Gross knew Speizman to be an experienced and knowledgeable investor in many types of securities, and nothing occurred during the course of the telephone conversation which would reasonably put Gross on notice that his customer may not have been equally knowledgeable in this instance as to the nature of the securities which his company owned.

Appellant also assigns as error the trial court's refusal to submit to the jury plaintiff's tendered issues of mutual mistake and negligence and its failure to give the jury plaintiff's tendered instructions on these issues. In these actions of the trial court we find no error. To justify the submission of an issue it must not only arise on the pleadings, but must be supported by competent evidence. *Gunter v. Winders,* 256 N.C. 263, 123 S.E. 2d 475. As noted above, these issues did not arise on the evidence in this case.

[4] Appellant contends the trial court erred in finding defendants' witness Abernethy to be an expert in the field of buying and selling stocks and in permitting the witness to express an opinion in response to a hypothetical question. "Whether a witness has the requisite skill to qualify him as an expert is chiefly a question of fact, the determination of which is within the exclusive province of the trial judge." To qualify a witness as an expert, "[i]t is enough that, through study or experience, or both, he has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject. A finding by the trial judge that the witness possesses the requisite skill will not be reviewed on appeal unless there is no evidence to support it." Stansbury, N. C. Evidence, 2d Ed., § 133, p. 316. Here, there was evidence that the witness had been engaged in the securities business in various capacities for many years, for more than twenty-five years as an official of a broker dealer firm. There was ample evidence to support the court's finding that he was an expert in this field.

[5] Appellant contends the trial court erred, nevertheless, in stating its finding that the witness was an expert in the presence of the jury, citing *Galloway v. Lawrence,* 266 N.C. 245, 145 S.E. 2d 861. In that case the defendant, a surgeon in a malpractice suit, was offered as an expert witness. The trial court, in the presence of the jury, found him to be a medical expert.

On appeal, the Supreme Court held that the ruling should have been made in the absence of the jury, "for it was an expression of opinion by the court with reference to the professional quali- fications of the defendant" and "might well have affected the jury in reaching its decision that the child was not injured by the negligence of the defendant." Accordingly, the Supreme Court held that the trial court's comments made in the presence of the jury finding defendant to be a medical expert constituted prejudicial error, since "they dealt with the very questions which the jury was called upon to decide." In the present case the witness involved was not a party to the litigation and finding him to be an expert in no way dealt with any question which the jury was called upon to decide. Under the circum- stances of this case we find no prejudicial error when the trial court stated its ruling in the presence of the jury.

[6] We have considered appellant's remaining assignments of error and find them without merit. Evidence as to prior trans- actions between Speizman and Gross, while not bearing directly upon the issues in the case, was relevant to establish the course of conduct customarily followed in transactions between the two men. This in turn could provide a basis for determining whether customary procedures were followed in the present case and whether these resulted in a binding contract between the parties. To be relevant, "it is not required that the evidence bear directly on the question in issue, and it is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known to properly understand their conduct or motives, or to weigh the reasonableness of their contentions." *Bank v. Stack*, 179 N.C. 514, 103 S.E. 6.

The court's charge to the jury adequately declared and explained the law arising on the evidence given in the case and, considered as a whole and contextually, was free from prej- udicial error. In the trial and judgment appealed from we find

No error.

Judges BRITT and MORRIS concur.