IN RE: PROCEEDINGS FOR THE CONDEMNATION OF A FEE SIMPLE IN-
TEREST IN LAND OWNED BY: R. D. LEE, RACHEL LEE, W. R. SOR-
RELL, CHARLES B. LEE, MARGARET G. LEE, WILLIAM D. LEE, ANN
McLEOD LEE, JOHNNIE G. LEE, SHERRY W. LEE, HAZEL F. YOUNG,
ISABELLA McKAY YOUNG, BECKER SAND AND GRAVEL COMPANY,
INC., DUNN PRODUCTION CREDIT ASSOCIATION, EDGAR R. BAIN,
TRUSTEE, AND MRS. CAROL P. PARKER, EXECUTRIX OF THE ESTATE OF E. A.
PARKER

No. 8311SC107

(Filed 3 July 1984)

1. **Eminent Domain § 6.7— economic feasibility of mining condemned land—ad-**
**missibility of evidence**

In a condemnation proceeding in which an issue was presented as to whether the value of the condemned land was affected by a sand and gravel deposit underlying it, the general subject of the economic feasibility of mining the sand and gravel deposit on the tract and of processing the minerals was relevant and open to cross-examination and rebuttal by the condemnor where the question of the economic feasibility of mining the deposit and the related questions of the economic feasibility of building a processing plant on the site before the taking and the feasibility of processing the minerals at a nearby plant were raised by respondent landowners during their case in chief.

**2. Eminent Domain § 6.5— opinion as to value—market data method based on hearsay—admissibility**

An expert's opinion as to the highest and best use of condemned property and the value thereof using the "market data" or "direct sales comparison" method was admissible although it was based partly on hearsay information from others concerning sales of other lands where such hearsay was inherently reliable in that it was from disinterested persons and involved routinely sought information for a standard method of appraising real estate.

**3. Trial § 10.3— court's questioning of witness—declaration that witness was expert—no expression of opinion**

The trial court did not express an opinion on the credibility of a witness in violation of G.S. 1A-1, Rule 51(a) by questioning the condemnor's expert witness or by ruling in the presence of the jury that the witness was an expert in the testing of sand and gravel deposits where the court's questions were clearly for clarification purposes, and where the witness was not a party to the litigation and declaring him to be an expert in no way touched upon any question which the jury had to decide.

**4. Eminent Domain § 5— amount of compensation supported by evidence**

The evidence in a condemnation proceeding was sufficient to support a conclusion that the highest and best use of the subject lands was farming and limited residential, not mining of sand and gravel, and the amount of compensation awarded by the jury was consistent with such a conclusion. The fact that the landowners introduced evidence of damages in amounts exceeding the award does not show an abuse of discretion in refusing to set aside the verdict since the jury was not compelled to accept the landowners' testimony with respect to their damages.

APPEAL by respondents from *Britt, Judge.* Judgment entered 9 June 1982 in Superior Court, HARNETT County. Heard in the Court of Appeals 10 January 1984.

The County of Harnett instituted this proceeding to condemn 34.65 acres of land for use by the public as an airport in 1979, pursuant to the then existing Chapters 153A and 160A of the North Carolina General Statutes. The preliminary condemnation resolution was filed on 12 June 1979, and the taking occurred on 24 August 1979.

A board of three lay appraisers was appointed pursuant to G.S. Chapter 160A, Article 11. The appraisers filed a majority report concurred in by two appraisers on 15 August 1979. The majority awarded net compensation of $261,596 to the respondent landowners for the partial taking of 34.65 acres from their 705.9 acre tract. The minority report, filed on the same date, awarded

net compensation of $76,535. The county estimated damages for the taking in accordance with the minority report and appealed from the award of compensation of $261,596 to the Superior Court for trial *de novo*.

In May and June of 1982, a jury trial was held upon the issue of the amount of just compensation respondents were entitled to for the partial taking of their property. The jury fixed compensation at $94,600. The respondents' motion to set aside the verdict as contrary to the weight of the evidence was denied. Judgment was entered upon the verdict and respondents appeal.

*Johnson and Johnson, P.A., by W. A. Johnson, for respondent appellants.*

*Woodall, McCormick & Felmet, P.A., by Edward H. McCormick and L. Holt Felmet, for petitioner appellee.*

JOHNSON, Judge.

This appeal arises out of a condemnation proceeding. The petitioner, Harnett County (the County) took 34.65 acres from respondents' 705.9 acre tract of land for an airport. The respondent landowners appeal from the award of $94,600 in damages for the partial taking. The questions presented concern whether the trial court erred in its evidentiary rulings, erred by expressing an opinion on the evidence, and erred in failing to set aside the verdict on the issue of compensation. We find no error and affirm.

I

The evidence presented at trial showed that on 12 June 1979, and for several years prior thereto, respondent W. R. Sorrell owned a one-half (1/2) undivided interest and respondent R. D. Lee and several members of his family owned the other one-half (1/2) undivided interest in a 705.9 acre tract of land in Neill's Creek Township, Harnett County. The land is about one mile east of Campbell University, a few hundred yards south of U.S. Highway 421.

At a time when R. D. Lee owned the entire tract (March, 1967), Lee negotiated a lease granting to respondent Becker Sand and Gravel Company, Inc. (Becker) the right to mine and remove sand and gravel from the 705.9 acre tract. Under the terms of the

lease, Becker paid no money to the lessor at the time the lease was executed. A royalty agreement was included in the lease, under which Becker was to pay Lee ten cents (10¢) per ton for gravel and five cents (5¢) per ton for sand at the time of mining. The lease was for a term of 30 years, with an option to renew for 20 more years at no front end charge. At the time of the taking, Becker had not mined any sand or gravel on the tract and had not given notice of an intent to mine.

Subsequent to execution of the mineral lease, ownership of a one-half interest in the subject tract passed from R. D. Lee to Dr. W. R. Sorrell. At the time of the taking in 1979, certain of R. D. Lee's children, who farmed the land with him, also owned fractional interests in the land, and the group of other condemnees includes holders of security interests, trustees under Deeds of Trust and a representative of a trustee under one Deed of Trust.

Becker Sand and Gravel had been mining sand and gravel deposits on the opposite side of the Cape Fear River from the subject tract since 1953 and had an existing processing plant there. Other than the Lee-Sorrell tract, Becker had no deposits tied up by either lease or purchase on the immediate opposite side of the river from its existing plant and Becker had no processing plant on that side of the river.

At the time of the taking, the Lee-Sorrell tract was being used for the cultivation of row crops, tobacco, cotton, corn and soybeans. There was also some pasture land. About 350 acres were cleared and in cultivation. The R. D. Lee residence was located on the tract near the 34.65 acre portion taken for the airport. The taking included 800 feet of road frontage on a rural paved road known as Old Stage Road. Additionally, the County closed 1000 feet of a dirt road which previously ran across airport property to the Old Stage Road. However, a new 3000 foot paved access road was constructed down the edge of airport property, which joined the remaining portion of the dirt road at the Lee home.

The original majority report of appraisers Owens and Joyner, which fixed compensation at $261,596, and the minority report of Bobby Wicker, which fixed compensation at $76,535, were read to the jury in their entirety. Additionally, appraisers Owens and Wicker testified at trial. Owens testified that his friend Dr. Sor-

rell had asked him to be an appraiser and "represent him on his side"; that he had taken the values for both mining *and* farming into account in his appraisal; but conceded that the fields could not be both mined and farmed at the same time.

In addition to the two members of the board of appraisers, the jury heard widely diverse opinions about damages to the property which resulted from the taking. The landowner's other witnesses included:

1. W. R. Sorrell (landowner), who testified, *inter alia*, that before the airport was placed there, the owners could have sold 25.5 acres along the paved and unpaved road for $3,000 per half acre as building lots, and that the land taken which was off the road was worth $3,000 per acre; further that additional acreage had been reduced in value. He assessed total damages at $370,000. Sorrell did not take the sand and gravel into consideration in fixing the damages.

2. Charles B. Lee (landowner) testified to an amount and manner of arriving at damages which was similar to Sorrell's, and Lee assessed damages at $367,000; Lee also failed to take the sand and gravel into account in fixing the damages.

3. O. F. Patterson, III, a geologist, testified that he had been employed only to appraise the sand and gravel affected by the taking. He testified that in addition to the 34.65 acres taken, 40 acres to the east was rendered unminable by the taking. Patterson testified that the market royalty rate in this area in August, 1979 was 10-12 cents per ton for sand and 18-25 cents per ton for gravel. He testified that in his opinion the sand and gravel under the airport tract and the 40 acres to the east had a value of $560,500 which he arrived at as follows:

| | |
|---|---|
| — Total tons sand, 1,700,000 × 25¢ | 437,500 |
| — Total tons gravel, 486,000 × 25¢ | 121,500 |
| TOTAL | 559,000 |

Value witnesses for the County other than Mr. Wicker, who was a member of the board of appraisers, included:

1. Mr. James Snipes, a member of the Society of Real Estate Appraisers and operator of a real estate business in Dunn,

North Carolina. He gave his opinion that the highest and best use of the tract was for crop production, timber growing and some residential use. Snipes testified that he had appraised the subject properties using the market data approach before and after the taking and that in his opinion the damages were $88,000. Snipes testified further that the market for residential lots in the area of the taking was limited, as evidenced by a subdivision one-half mile away which had been under development for six to nine years and had only eight to ten houses on it.

2. Mr. Charles M. Hartsock, a member of the American Institute of Real Estate Appraisers and operator of a real estate business in Raleigh, North Carolina testified that in his opinion, the highest and best use of the tract of land was as a farm. Hartsock testified that he had considered mining sand and gravel as an alternative use. In appraising the land for mining, he had used the income streaming approach; that to analyze investment mining properties one had to know the quantity of minerals, the market royalty rate and the length of time it would take to mine the tract. In Hartsock's analysis he used the quantities and royalty rates testified to by respondents' witness Patterson and estimated the time involved based on his judgment, backed by testimony he heard regarding the number of acres that could be mined per year. Using the income streaming method, he arrived at a value of approximately $1300 per acre for the land as mineral land. Hartsock then repeated that in his opinion, the highest and best use of the land before and after the taking was for farming and that the damages were $97,100.

In addition to value witnesses, the jury heard testimony from Mr. Steve Howiler, currently vice president of operations for Becker Sand and Gravel Company. Mr. Howiler testified on behalf of respondents that in his opinion, it was economically feasible to mine the Lee-Sorrell tract. Through Howiler, respondents introduced Becker's original log sheets on test holes drilled, color coded plats and other business records which related to the tract which had been prepared in 1967, at the time the lease was negotiated.

The County called Mr. Clarence Gelder, who testified that he had worked for Becker Sand and Gravel Company for 22 years

prior to going into a business of his own. Gelder testified that he had been a vice president of Becker and that in 1953, he had located the deposit of sand and gravel immediately across the Cape Fear River from the Lee-Sorrell tract, which deposit Becker was still mining. This operation was known as the Senter Plant. Gelder testified that he negotiated the 1967 lease with R. D. Lee and that the drilling records, maps, and test data sheets introduced by respondents had been done under his supervision at Becker. In Gelder's opinion, it had not been economically feasible to mine the Lee-Sorrell tract in 1967. Gelder stated that he decided to negotiate the lease because it provided him a chance to hold a base of 700 acres for 50 years at no cost and that it was possible that the tract might be in the middle of additional tonnage which was not then known. Gelder testified that on the basis of the 1967 test hole data, it was his opinion that on the condemned 34.65 acres, there were only 8 acres that contained a sand and gravel deposit and that it contained 8000 tons of gravel per acre, and twice that quantity of sand. Further, that in his opinion, it was still not economically feasible to mine the Lee-Sorrell tract in 1979.

## II

[1] The respondent landowners contend that the trial court erred when it allowed into evidence, "a substantial quantity of irrelevant, incompetent and prejudicial evidence over the objection of the respondents." Most of the testimony objected to came from the witness Clarence Gelder and concerned the question of the feasibility of mining the sand and gravel deposits on the Lee-Sorrell tract. Respondents have listed ten specific areas of inquiry which they argue petitioners were prejudicially allowed to pursue on both cross-examination and rebuttal. These are as follows:

A. The mining operation at the Senter Plant.

B. The overburden at the Senter Plant.[1]

C. The sand and gravel on a tract nine miles south of Fayetteville.

D. The total gravel tonnage on the Lee-Sorrell property.

---

1. "Overburden" is the amount of material above the deposit to be removed.

E. The amount of sand on the Lee-Sorrell property.

F. The market ratio between sand and gravel.

G. The size of the Lee-Sorrell deposit and that it was not economically feasible to construct a processing plant on the property in 1967.

H. Why the Lee-Sorrell property was leased.

I. The cost of $150 a hole to drill the sixty-two test holes on the Lee-Sorrell property on or about 24 August 1979.

Respondents primarily take issue with the admission of Gelder's testimony regarding the economic feasibility of constructing a processing plant on the Lee-Sorrell property in 1967 and the testimony regarding the circumstances of Becker's lease of the mining rights at that time. We find no error.

It was the jury's duty in this case to determine whether the value of the Lee-Sorrell tract was affected by the mineral deposit underlying it. In order to make this determination, they had to know whether mining the deposit was economically feasible. The question of the economic feasibility of mining the deposit, the related questions of the economic feasibility of building a processing plant on the site before the taking in 1979, as well as the feasibility of processing the subject minerals through the nearby Senter Plant had all been raised by respondents during their case in chief through witnesses Patterson and Howiler. Cross-examination on every phase of examination in chief "is an absolute right and not a mere privilege." *Riverview Milling Co. v. Highway Commission*, 190 N.C. 692, 696, 130 S.E. 724, 726 (1925). Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially. *Highfill v. Parrish*, 247 N.C. 389, 100 S.E. 2d 840 (1957). Therefore, the general subject of the economic feasibility of mining the Lee-Sorrell mineral deposit and of processing the minerals extracted therefrom was both relevant and open to cross-examination and rebuttal by the County.

Respondents, however, argue that admission of Gelder's opinion that on-site construction of a processing plant in 1967 was ir-

relevant and prejudicial because it was likely to have had a negative impact on the jury's assessment of the 1979 value of the sand and gravel deposits. Further, that this testimony, as well as Gelder's opinion that it was also economically infeasible to build a processing plant on the property in 1979, could have caused the jury to conclude that the minerals would not be mined and therefore to exclude their value in their award of compensation. We find no prejudice by reason of admission of this testimony.

Again, respondents first raised the issue of the economic feasibility of such a plant in their examination in chief. Mr. Howiler had testified on direct examination that before the taking, in his opinion, it would have been economically feasible to mine the deposit by building an on-site processing plant. Gelder's testimony, then, constituted permissible rebuttal evidence on this issue. *Highfill v. Parrish, supra.* Furthermore, Gelder had previously laid the foundation for the relevance of his testimony concerning the feasibility of an on-site plant in 1967. Gelder testified that his work since leaving Becker in 1970 involved the use of sand, gravel and crushed stone and that he was concerned about the quality of his materials. In later testimony Gelder stated that he had been involved in the design of such a plant in 1979. He testified that there had been no significant changes in the methods by which one would set up a plant operation since 1967 and that the component parts for a plant had not become cheaper since then either. The testimony elicited would, therefore, have been relevant had the County presented it in its case in chief, and was also entirely proper as rebuttal evidence.

Much the same may be said of Gelder's testimony concerning Becker's original intention in negotiating the mineral lease. Respondents orally argued that this testimony was irrelevant and prejudicial because the fact that Becker did not pay anything for the lease would lead the jury to believe that the property was worthless. Again, the subject of the motivation for Becker's original lease was addressed by respondents during their case in chief. On direct examination, Mr. Howiler testified that the rights to the minerals on the Lee-Sorrell tract were negotiated for reserve purposes and, as such, were of central importance to Becker. Further, that Becker had every intention of mining it. The testimony of Mr. Gelder that he negotiated the mineral lease because he had an opportunity to hold a lease on 700 acres for 50

years at no cost and that the deposit might be in the middle of other deposits not then known was properly offered and admitted as rebuttal evidence. *Highfill v. Parrish, supra.* We have carefully examined the other testimony objected to by respondents and conclude that it too was properly admitted into evidence.

### III

[2]  Next, respondents contend that the trial court committed reversible error in allowing the expert witness, James Snipes, to give opinions which were based in significant part on hearsay evidence. We do not agree.

Mr. Snipes testified that he used the market data approach in making his appraisal for the County. Snipes then described the method in great detail; it is also known as the direct sales comparison method and, by its very nature, uses information from others. Snipes, then, using the market data approach, determined that the highest and best use of the owners' land was farming and not sand and gravel mining. This opinion was based upon facts he obtained in his market data investigation.

The testimony objected to came in response to questions regarding Snipes' investigation of other possible uses for the property than farming.

Q. And what uses were they?

A. Well, mineral rights, sand and gravel. I was given information and read the existing lease on the property for minerals and gravel at that time. I investigated and talked with knowledgeable sources about the potential —

MR. JOHNSON: Objection.

THE COURT: Overruled.

THE WITNESS: — of it for that.

Q. And what was your basis for arriving at the opinion that the highest and best use of the property was farming and limited residential?

A. Based on —

MR. JOHNSON: Objection.

THE COURT: Overruled.

THE WITNESS: My information indicated that rural farmland comparable to the subject that was being sold for mineral rights—that use was not bringing nearly as much per acre as farmland was bringing.

Respondents argue that Snipes' partial reliance on hearsay rendered his expert opinion on the most critical issue in the case inadmissible. Specifically, they contend that there is no way to determine whether this hearsay was valid, accurate, reliable or relevant and that to the extent it was incorrect, the testimony of Snipes based on it was incorrect.

Respondents rely upon *Cogdill v. Highway Comm.*, 279 N.C. 313, 182 S.E. 2d 373 (1971) and *Todd v. Watts*, 269 N.C. 417, 152 S.E. 2d 448 (1967) to argue that an expert cannot base his opinion on hearsay. However, as noted in 1 Brandis on N.C. Evidence, § 136, n. 27 (2nd Rev. Ed. 1982), the rule of *Todd* has effectively been overruled by *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979). In *Wade*, the court held that a physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied to him by others, including the patient, if such information is inherently reliable, even though it is not independently admissible into evidence. *See also State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794 (1974). In addition, if his opinion is admissible, the expert may testify to the information he relied on in forming it for the purpose of showing the basis of the opinion. *State v. Wade, supra; Penland v. Coal Co.*, 246 N.C. 26, 97 S.E. 2d 432 (1957). An expert witness has wide latitude in gathering information and may base his opinion on evidence not otherwise admissible. *State v. DeGregory, supra; Ballenger v. Burris Industries, Inc.*, 66 N.C. App. 556, 311 S.E. 2d 881 (1984) (information concerning patient's brother's genetic disease obtained from another physician is inherently reliable hearsay and is properly received into evidence to show the basis of the expert's opinion).

In the case under discussion, Snipes explained that by its nature, the "market data" or "direct sales comparison" method depends on information from others.

Q. How did you select your comparables?

A. I got them from what we call the market, go out and seek sales, talk to people knowledgeable that know where a farm sale has been in the past six to twelve, fifteen months, talk to buyers and sellers, attorneys that have handled sales, selling agents who have handled farmland.

On cross-examination, Snipes explained this method of using comparables as follows:

Q. So, then, what you have given the jury is what somebody else told you rather than what you know?

A. Well, I went by expert knowledge. I went by other sand and gravel people who had bought farmland in Harnett County one year prior to this for sand and gravel mineral rights that sold for six to nine and twelve hundred dollars an acre, where farmland was selling for eighteen and nineteen hundred dollars an acre.

We conclude that the hearsay relied upon by the expert witness Snipes in forming his opinion was inherently reliable for the following reasons:

1. The hearsay itself was from disinterested persons — sand and gravel people — who were not party to the lawsuit.

2. The investigation included the experiences of more than just one "sand and gravel" person.

3. The hearsay involved is routinely sought as the basis for a standard method of appraising real estate, i.e., the market data method. The market data or comparable sales method is one of the standard methods, according to Snipes, by which professional real estate appraisers gather data from others which they use to form an opinion on value.

Accordingly, Snipes' expert opinion was admissible on the question of the highest and best use of the subject property as well as on the question of value. It was properly left for the jury to weigh its reliability. Furthermore, the testimony could not have been prejudicial to respondents since the point was also made by Charles Hartsock, who, by use of a different method, came to essentially the same conclusion as Snipes on the question of land use and value.

IV

[3] Respondents also contend that the trial court committed reversible error by expressing an opinion in violation of G.S. 1A-1, Rule 51(a). Specifically, they argue that the court expressed an opinion by its questioning of the County's expert witness Clarence Gelder, and by qualifying him as an expert in the presence of the jury. Respondents rely on *Galloway v. Lawrence*, 266 N.C. 245, 145 S.E. 2d 861 (1966) and *Rannbury-Kobee Corp. v. Machine Co.*, 49 N.C. App. 413, 271 S.E. 2d 554 (1980) for the proposition that the trial court's declaration in the presence of the jury that a witness is an opinion on the credibility of the witness in violation of G.S. 1A-1, Rule 51(a).

The record reveals that the County attempted to offer Mr. Gelder as an expert in three areas. The court accepted Gelder as an expert in the area of sand and gravel mining operations and in the area of the economic feasibility of establishing a mining operation. However, there was some confusion over the third area, which concerned the testing of sand and gravel deposits (quantum testing to determine the percentage of sand and gravel at each level of depth). After the County attempted unsuccessfully to qualify the witness in this area, the court asked the witness a series of questions and, apparently satisfied with the results, declared Gelder to be an expert in each of the three areas. Respondents argue that the court's questions went beyond clarification and, together with the declaration, prejudiced their position with respect to the important issues of the case. We do not agree.

First of all, the record shows the questions propounded by the court to have been straightforward and clearly asked for the purposes of clarification. Secondly, the declaration of Gelder as an expert in the testing of sand and gravel deposits did not constitute an impermissible expression of judicial opinion on his credibility.

It is axiomatic, of course, that it is the lawful right of every litigant to expect utter impartiality and neutrality in the judge who tries his case and to have as well an equally unbiased and properly instructed jury. This right can neither be denied nor abridged. . . . Any remark of the presiding judge made in the presence of the jury which has a tendency to

prejudice the jury against the unsuccessful party may be grounds for a new trial. (Citations omitted.)

*Colonial Pipeline Co. v. Weaver*, 310 N.C. 93, 103, 310 S.E. 2d 338, 344 (1984). Significantly, after stating these maxims, the court continued as follows:

> However, remarks made by the trial court in the jury's presence do not always constitute prejudicial error. Judges are not merely mute observers of the legal drama before them. They are the most important participants in the search for truth through trial by jury. (Citations omitted.)

In *Colonial Pipeline*, the trial court's comment upon witness testimony that, "I don't believe that is relevant" was held not to constitute prejudicial error. In the case at bar, the trial court's *manner* of examining the expert witness with regard to his qualifications was absolutely neutral and in no way prejudicial to respondents. Nor can the declaration of Gelder to be an expert in the presence of the jury be taken as prejudicial error.

*Galloway v. Lawrence, supra*, relied upon by respondents, involved a medical malpractice action wherein the defendant physician testified as a witness in his own behalf. The Supreme Court held that the trial court inadvertently erred in making a statement in the presence of the jury. The statement indicated that the court found as a fact that the defendant is "an expert physician in surgery." The court reasoned that the ruling should have been made in the absence of the jury because it was an expression of opinion with reference to the professional qualifications of a *defendant* in a *professional malpractice suit* and, as such, "might well have affected the jury in reaching its decision that the [plaintiff] child was not injured by the negligence of the defendant." 266 N.C. at 250, 145 S.E. 2d at 866. *Rannbury-Kobee Corp. v. Machine Co., supra*, also relied upon by respondents, involved a breach of contract claim and was decided under the rule of *Galloway*. Although the witness in *Rannbury-Kobee* was not himself a party to the actions, the record established that he was the president of the defendant Company; he had negotiated the subject contract with plaintiff; he had designed the machine which was the subject of the contract according to plaintiff's specifications; and he had supervised, tested and delivered the machine as well as having billed the plaintiff for it.

Clearly, the declarations by the trial court that the defendant in *Galloway* and the witness in *Rannbury-Kobee* were experts in their respective fields constituted prejudicial error, since the declarations dealt with the very question which the jury was called upon to decide—professional competency. Here, the witness involved was not a party to the litigation and declaring him to be an expert in no way touched upon any question which the jury had to decide. The qualification of Gelder as an expert with respect to quantum testing in no way harmed the respondents since the County did not challenge the quality of the sand and gravel on the Lee-Sorrell tract. It only sought to challenge the quantity determinations made by their witness, Russ Patterson. Therefore, under the circumstances of this case, we find no prejudicial error by virtue of the trial court's stating its ruling in the presence of the jury. *See also Speizman Co. v. Williamson*, 12 N.C. App. 297, 183 S.E. 2d 248, *cert. denied*, 279 N.C. 619, 184 S.E. 2d 113 (1971) (*Galloway* rule not applicable to non-party expert witness).

V

[4]  Finally, respondents contend that the trial court committed reversible error in denying their motion to set aside the verdict and in entering the judgment thereon because the compensation awarded by the jury was "grossly inadequate." Respondents argue that in view of the evidence presented by the parties, "it seems apparent that the jury either ignored this evidence, ignored the instructions of the court, was improperly affected by the opinions expressed by the court during the course of the trial, or by some other unknown and undiscoverable prejudice against the respondents."

To the contrary, we find it clear from the record that competent evidence was presented to the jury to support a conclusion that the highest and best use of the subject lands was not mining and that open face mining of sand and gravel was inconsistent with other uses such as farming and limited residential. The amount of compensation awarded was consistent with such a conclusion. Although the testimony given on value was widely divergent, the jury, as the trier of fact, was entitled to pass upon the weight and the credibility of the testimony of the various witnesses, and to make its decision accordingly. The jury was in-

structed that they had the right to believe all, part or none of what any witness said. We find no evidence of prejudice to the respondents in the record of either the "known" or "unknown and undiscoverable" variety.

The respondents have not demonstrated that the trial court abused its discretion in refusing to set aside the verdict in view of the evidence presented. *See Goldston v. Chambers*, 272 N.C. 53, 157 S.E. 2d 676 (1967). The fact that the landowners introduced evidence of damages in amounts exceeding the award does not show such an abuse of discretion, because the jury is not compelled to accept the respondent landowners' testimony with respect to their damages. *Brown v. Griffin*, 263 N.C. 61, 138 S.E. 2d 823 (1964). Accordingly, the trial court did not commit reversible error in entering and signing the judgment in this cause.

In conclusion, we have carefully examined the arguments presented and conclude that the respondent landowners had a fair and impartial trial, free from prejudicial error.

No error.

Chief Judge VAUGHN and Judge PHILLIPS concur.