585 S.E.2d 446 (2003)
MURPHY FAMILY FARMS and Murphy Farms, Inc. d/b/a Murphy Family Farms, Petitioners,
v.
NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, Respondent.
No. COA02-1205.
Court of Appeals of North Carolina.
September 16, 2003.
*447 Jordan Price Wall Gray Jones & Carlton, PLLC, by Henry W. Jones, Jr. and Brian S. Edlin, Raleigh, for petitioners-appellees.
Roy Cooper, Attorney General, by Jill B. Hickey, Assistant Attorney General, and Francis W. Crawley, Special Deputy Attorney General, for the State.
STEELMAN, Judge.
Respondent, the North Carolina Department of Environment and Natural Resources (DENR), appeals a judgment that reversed portions of a final agency decision involving water violations and hog waste. For the reasons discussed herein, we affirm in part and reverse in part.
Petitioner, Murphy Family Farms (Murphy), operates a hog production facility known as Vestal Farms in Duplin County, North Carolina. Prior to 1998, Murphy treated its animal waste in five lagoons. On 19 June 1998, Murphy obtained a permit to operate an innovative waste treatment system. This system was used in lieu of the lagoons to treat the animal waste. The innovative system was a "closed loop system" which treated the waste and then recycled the water to the hog operations. Murphy's permit provided that if the innovative system failed, then the waste could be temporarily diverted to the five lagoons.
Prior to April 1999, sand and grit accumulated in the aeration basin of the innovative treatment system. To correct this problem, Murphy pumped 120 cubic yards of sand and grit and 170,000 gallons of wastewater into Lagoon 3 on 16-18 April 1999. On 19 April 1999, Lagoon 3 breached and discharged over one million gallons of wastewater into Persimmon Branch of the Cape Fear River Basin.
After the breach, the Division of Water Quality of DENR performed tests each day from 19 April 1999 to 26 April 1999 at five sample stations along Persimmon Branch. These tests showed violations of the dissolved *448 oxygen water quality standards on each of the eight days. The tests also showed violations of fecal coliform bacteria standards on 19-23 April 1999.
DENR assessed civil penalties against Murphy for violations of Chapter 143 as follows:

 $ 4,000 for making an outlet to the waters of the
 State without a permit required by G.S.
 143-215.1(a)(1).
 $ 26,000 for 8 of 8 violations of G.S. 143-
 215.1(a)(6) and NCAC 2B.0211(3)(b) by
 exceeding the water quality standard for
 dissolved oxygen over the period April 19
 through April 23, 1999.
 $ 3,250 for one violation of G.S. 143-215.1(a)(1)
 and NCAC 2B.0211(3)(e) by exceeding
 the water quality standard for fecal coliform
 bacteria over the five-day period
 April 19 through April 23, 1999.
 $ 1,250 for one violation of G.S. 143-215.6A(a)(2)
 by failure to comply with Permit No.
 AWI310082, Part II, Condition 4 (to
 divert stormwater from the animal
 wastewater facility).
 $ 1,250 for one violation of G.S. 143-215.6A(a)(2)
 by failure to comply with Permit No.
 AWI310082, Part III, Condition 6g (failure
 to notify the Regional Office within
 24 hours following any interruptions or
 failures of the animal waste management
 system).
 $ 1,250 for one violation of G.S. 143-215.6A(a)(2)
 by failure to comply with Permit No.
 AWI310082, Part III, Condition 6 (failure
 to provide a written report to the Regional
 Office within 5 calendar days of
 the lagoon failure).
 $ 37,000 TOTAL CIVIL PENALTY, which is 25.7
 percent of the maximum penalty authorized
 by G.S. 143-215.6A.
 $ 3,650.33 Enforcement costs
 $ 40,650.33 TOTAL AMOUNT DUE

Murphy requested a contested case hearing before an administrative law judge (ALJ). The ALJ entered a recommended decision as follows: (1) a reduction in the civil penalties from $37,000.00 to $9,750.00; and (2) a proportional reduction in enforcement costs to $963.60. The ALJ reduced the number of dissolved oxygen violations from eight to one. He further reduced the amount of the penalties for the dissolved oxygen and fecal coliform bacteria violations from $3,250.00 to $2,250.00 per violation and stated that Murphy did not violate the notice provisions of its permit. Both parties appealed.
On 19 February 2001, the Environmental Management Commission (EMC) rendered a final agency decision. The EMC did not adopt portions of the ALJ's recommended decision, but reduced the penalties to $32,500.00 due to mathematical errors. It found eight violations of the dissolved oxygen levels and two notice violations. Enforcement costs of $3,650.33 were awarded. Petitioner filed a petition for judicial review in the Duplin County Superior Court on 26 March 2001.
The trial court refused to uphold the penalties as determined by the EMC. The trial court ordered that petitioner pay: (1) $4,000.00 for making an outlet to State waters without a permit; (2) $2,250.00 for one violation of the water quality standards for dissolved oxygen; (3) $2,250.00 for one violation of exceeding the water quality standard for fecal coliform bacteria; (4) $1,250.00 for one violation of failing to divert storm water from the system; and (5) $1,011.14 for investigation and enforcement costs. The trial court found no notice violations under petitioner's permit. Respondent appeals.
In reviewing the trial court's order on a final agency decision, this Court must determine whether the trial court: (i) applied the correct standard of review; and (ii) whether it did so properly. Dillingham v. North Carolina Dep't. of Human Resources, 132 N.C.App. 704, 708, 513 S.E.2d 823, 826 (1999). The standard of review by the trial court is determined by the type of error asserted; errors of law are reviewed de novo, while the `whole record test' is applied to allegations that the agency decision was not supported by the evidence, or was arbitrary and capricious. Woodburn v. N.C. State Univ., 156 N.C.App. 549, 551 577 S.E.2d 154, 156 (2003) (citations omitted); Hedgepeth v. North Carolina Div. of Servs. for the Blind, 142 N.C.App. 338, 346-47, 543 S.E.2d 169, 174 (2001).[1] Here, the allegations contend that the agency's decision was an error *449 of law. Thus, the trial court appropriately applied de novo review.
In its first assignment of error, respondent argues that the trial court erred in failing to uphold the eight violations of the water quality standards for dissolved oxygen. We agree.
The trial court concluded:
[Petitioner] committed one violation of N.C. Gen.Stat. § 143.215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b) by causing or permitting any water, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards for dissolved oxygen. The Final Agency Decision was affected by other error of law when it interpreted and applied N.C. Gen.Stat. § 143.215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b) to conclude [petitioner] committed eight separate violations on the facts, prejudicing the substantial rights of [petitioner]. [Petitioner's] undisputed evidence demonstrated that all of the contents of lagoon number 3 discharged on 19 April 1999. Pursuant to N.C. Gen.Stat. § 150B-51(b), the Final Agency Decision is therefore modified to conclude [petitioner] committed one violation of N.C. Gen.Stat. § 143.215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b).
The EMC has statutory authority to set standards for water quality. See N.C. Gen.Stat. § 143-214.1(a)(1) (2001). The North Carolina Administrative Code, in 15A N.C. Admin. Code 2B.0211(3)(b), sets forth the applicable standard for dissolved oxygen in the waters of this State. Section 143-215.1 of the North Carolina General Statutes provides, in pertinent part:
(a) Activities for Which Permits Required.No person shall do any of the following things or carry out any of the following activities unless that person has received a permit from the Commission and has complied with all conditions set forth in the permit:
....
(6) Cause or permit any waste, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications or in violation of any effluent standards or limitations established for any point source, unless allowed as a condition of any permit, special order or other appropriate instrument issued or entered into by the Commission under the provisions of this Article.
N.C. Gen.Stat. § 143-215.1(a)(6) (2001). Murphy was penalized for discharging waste into the waters of this State resulting in a violation of the dissolved oxygen standard under 2B.0211(3)(b) of the Administrative Code continuously for eight days.
There is no factual dispute that Murphy discharged wastewater into the waters of this State. Nor is there any question that this discharge resulted in a violation of the dissolved oxygen standards. The issue is whether there was one violation, based upon a single discharge on 19 April 1999, or eight violations from 19 April through 26 April 1999.
The provisions of N.C. Gen.Stat. § 143-215.1(a)(6) are stated in the disjunctive and not in the conjunctive. The prohibition contained in this section applies to waste "discharged to or in any manner intermixed with the waters of the State[.]" (Emphasis added). Murphy's violation under this section was that it caused its waste to be "intermixed" with the waters of this State in violation of the applicable water quality standards. This violation was ongoing for a period of eight days.
Section 143-215.6A provides that respondent may assess a penalty for each day that a violation continues:
(a) A civil penalty of not more than twenty-five thousand dollars ($25,000) may be assessed by the Secretary against any person who:
(1) Violates any classification, standard, limitation, or management practice established pursuant to G.S. 143-214.1, 143-214.2, or 143-215
....
(b) If any action or failure to act for which a penalty may be assessed under this section is continuous, the Secretary may assess *450 a penalty not to exceed twenty-five thousand dollars ($25,000) per day for so long as the violation continues, unless otherwise stipulated.
N.C. Gen.Stat. § 143-215.6A (2001). Because the waste discharged by Murphy continued to be intermixed with the waters of the State, respondent was entitled to assess a penalty under section 143-215.6A for each day that the violation continued. The trial court erred in reducing the number of dissolved oxygen violations from eight to one.
In its second assignment of error, respondent argues that the trial court erred in setting aside the two penalties it assessed for violations of notice requirements of Murphy's permit. We disagree.
Respondent alleged that petitioner violated Section IV, subsection 6(g) of its permit by failing to notify respondent within 24 hours following the interruption or failure of the animal waste management system and failing to notify respondent in writing within five days of the lagoon failure. The permit provides that:
6. Regional Notification
The Permittee shall report by telephone... as soon as possible, but in no case more than 24 hours following first knowledge of the occurrence of any of the following events:
....
(g) Any interruptions or failures of the animal waste management system that causes the emergency action plan to be initiated.
The first notice violation penalty was assessed for a failure to notify respondent within 24 hours of the time that sand, grit and wastewater was transferred from the innovative treatment system to Lagoon 3 on 16-18 April 1999. Under the provisions of paragraph 6(g), the notice requirement was triggered only by an interruption or failure "that causes the emergency action plan to be initiated." The pumping of sand, grit and wastewater into Lagoon 3 was an interruption of the innovative system. However, it was not an interruption that caused the emergency action plan to be initiated. Such a plan was to be implemented only "in the event that wastes from [the] operation [were] leaking, overflowing or running off site." None of these events occurred on 16-18 April 1999, the time period for which the penalty was assessed.
The second notice violation penalty was assessed for a failure to file a written report within five calendar days with respondent's regional office that sand, grit and wastewater were transferred from the innovative treatment system to Lagoon 3 on 16-18 April 1999. Under the terms of the permit, this reporting requirement was a supplement to the 24-hour reporting requirement discussed above. Since there was no requirement for petitioner to make a 24-hour report, there was no requirement to make a five-day written report. This assignment of error is without merit.
In its third assignment of error, respondent argues that the trial court erred by taxing the costs for petitioner's expert against respondent and by reducing the amount of the investigative costs. We agree as to the investigative costs.
It is within the trial court's discretion to tax costs against a party. N.C. Gen. Stat. § 6-20 (2001). Whether deposition expenses may be taxed as part of the costs is also within the trial court's discretion. Alsup v. Pitman, 98 N.C.App. 389, 390 S.E.2d 750 (1990). In Dixon, Odom & Co. v. Sledge, 59 N.C.App. 280, 286, 296 S.E.2d 512, 516 (1982), this Court held that "even though deposition expenses do not appear expressly in the statutes they may be considered as part of `costs' and taxed in the trial court's discretion." The deposition expenses must be reasonably necessary. Muse v. Eckberg, 139 N.C.App. 446, 533 S.E.2d 268 (2000); Sealey v. Grine, 115 N.C.App. 343, 444 S.E.2d 632 (1994).
The trial court's discretion will not be disturbed on appeal absent an abuse of discretion. Alsup, supra. Respondent did not contend that the costs were not reasonable. We hold that the trial court did not abuse its discretion, and affirm the trial court's decision to tax the deposition costs of petitioner's expert.
*451 As to the enforcement costs, the final agency decision stated that "The record supports total investigation and enforcement costs of three thousand six hundred fifty dollars and thirty-three cents ($3,650.33) which are assessed pursuant to N.C.G.S. § 143-215.3(a)(9)." The trial court concluded that "Investigative costs are modified commensurate with the Final Agency Decision as reversed or modified by the foregoing Conclusions of Law" and reduced the investigation enforcement costs to $1,011.14.
Section 143-215.3(a)(9) provides that:
If an investigation conducted pursuant to this Article or Article 21B of this Chapter reveals a violation of any rules, standards, or limitations adopted by the Commission pursuant to this Article or Article 21B of this Chapter, or a violation of any terms or conditions of any permit issued pursuant to G.S. 143-215.1 or 143-215.108, or special order or other document issued pursuant to G.S. 143-215.2 or G.S. 143-215.110, the Commission may assess the reasonable costs of any investigation, inspection or monitoring survey which revealed the violation against the person responsible therefor.
N.C. Gen.Stat. § 143-215.3(a)(9) (2003). Thus, any investigative and enforcement costs assessed by the EMC must: (1) be reasonable; and (2) have revealed a violation against the responsible person. The trial court made no findings about the reasonableness of the enforcement costs or whether they revealed violations. Rather, the trial court reduced these costs commensurate with the reduction in the amount of penalties assessed. We find no authority for such an approach in section 143-215.3(a)(9). In the instant case, the investigation by respondent found numerous violations of various statutes. We hold that the trial court erred in reducing the investigative and enforcement costs.
AFFIRMED IN PART; REVERSED IN PART.
Judge HUDSON concurs.
Judge WYNN dissents.
WYNN, Judge dissenting.
Because I disagree with the majority's holding that the trial court erroneously concluded only one violation of N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b) occurred, I dissent.
N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b), prohibit any person from causing or permitting any waste, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards delineated in the DENR regulations without a permit. In this case, Murphy Family Farms indisputably violated dissolved oxygen standards by discharging waste into North Carolina waters. However, under N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C. Admin. Code 2B.0211(3)(b), the discharge amounted to one violation, not a separate violation for each day that DENR chose to test the waters[2].
The majority, recognizing N.C. Gen.Stat. § 143-215.1(a)(6) is stated in the disjunctive, held Murphy's violation "was that it caused its waste to be intermixed with the waters of this State in violation of the applicable water quality standards for an ongoing period of eight days." However, "[i]n construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results." State ex rel. Commissioner of Ins. v. North Carolina Auto. Rate Administrative Office, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978); see also Hilgreen v. Sherman's Cleaners & Tailors, Inc., 225 N.C. 656, 36 S.E.2d 252 (1945)(stating that (1) statutes *452 imposing a civil penalty must be strictly construed and (2) "a literal reading [of a statute] which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and their legislative purpose).
N.C. Gen.Stat. § 143-215.1(a)(6) states:
(a) Activities for Which Permits Required.No person shall do any of the following things or carry out any of the following activities unless that person has received a permit from the Commission and has complied with all conditions set forth in the permit:
(6) Cause or permit any waste, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications or in violation of any effluent standards or limitations established for any point source, unless allowed as a condition of any permit, special order or other appropriate instrument issued or entered into by the Commission under the provisions of this Article.
As the majority stated, these provisions are stated in the disjunctive and not in the conjunctive. However,
the popular use of `or' and `and' is so loose, and so frequently inaccurate, that it has infected statutory enactments. For this reason, their strict meaning is more readily departed from than that of other words. In this respect, it is clear that the courts have power to change and will change `and' to `or' and vice versa, whenever such conversion is required by the context, or is necessary to harmonize the provisions of a statute and give effect to all its provisions, or to save it from unconstitutionality, or, in the general, to effectuate the obvious intention of the legislature.
Sale v. Johnson, 258 N.C. 749, 755-56, 129 S.E.2d 465, 469 (1963).
By enacting N.C. Gen.Stat. § 143-215.1(a)(6), the legislature intended to prevent the discharge or intermixing of pollutants with the waters of our State. See N.C. Gen.Stat. § 143-211. Under N.C. Gen.Stat. § 143-213(9), the legislature interpreted `discharge of waste' to include "discharge, spillage, leakage, pumping, placement, emptying, or dumping into the waters of the State." Moreover, the Oxford English Dictionary defines `intermix' as "to mix together, mix intimately or intermingle."
In this case, all of the waste from the Murphy lagoon was discharged in one day from one lagoon breach. This single discharge caused the intermixing of the waste with the waters of this State. Under these facts, without a clear mandate from our legislature, I believe it is inappropriate to impose civil penalties (based on the number of days DENR chose to test the waters) when a single event caused the discharge and the intermixing.
NOTES
[1] Section 150B-51(c) now provides that "[i]n reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the [ALJ's] decision, the court shall review the official record, de novo, and shall make findings of fact and conclusions of law." N.C. Gen.Stat. § 150B-51(c) (2003). However, this provision only applies to cases commenced on or after 1 January 2001 and is not applicable to the instant case, which was filed on 22 September 1999.
[2] After the lagoon's breach, the Division of Water Quality of the Department of Environment and Natural Resources established a monitoring period from 19 April 1999 through 26 April 1999, during which it conducted water quality evaluations. Although the water quality was below acceptable levels on each of these eight days, the Division of Water Quality did not conduct any tests after 26 April 1999. Nevertheless, Kerr T. Stevens, Director of Water Quality, testified during his deposition that if the testing had indicated substandard water quality levels after 26 April 1999, Murphy would have been cited for additional violations.